**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| PHILIP SIEFKE,<br>individually and on behalf of all<br>others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>TOYOTA MOTOR NORTH AMERICA, INC., PROGRESSIVE CASUALTY INSURANCE COMPANY, and CONNECTED ANALYTIC SERVICES,<br><br>*Defendants*. | Case No. 4:25-cv-00406-ALM |

**TOYOTA MOTOR NORTH AMERICA, INC.'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION AND MEMORANDUM OF LAW IN SUPPORT**

# TABLE OF CONTENTS

**Page(s)**


I. Introduction .......... 1

II. Background .......... 2

A. Plaintiff Activated Connected Services and Accepted Toyota's Connected Services Terms of Use .......... 2

B. Toyota's Terms of Use Include a Clear and Conspicuous Arbitration Provision and Class Action Waiver .......... 8

III. Argument and Citation to authority .......... 10

A. The FAA Applies and Requires Enforcement of Plaintiff's Arbitration Agreements. .......... 10

B. Plaintiff's Claims Are Subject to a Valid and Binding Arbitration Agreement. .......... 11

1. Plaintiff Accepted the Arbitration Provision in Toyota's Terms of Use .......... 11

i. Plaintiff Unambiguously Assented to the Terms of Use via Toyota's App and Through His Conduct .......... 12

ii. The Toyota App Reasonably Notified Plaintiff of the Terms of Use .......... 14

2. All of Plaintiffs' Claims Against Toyota Are Covered by the Arbitration Agreement .......... 18

i. Plaintiff's Arbitartion Agreement Delegates All Remaining Issues to the Arbitrator .......... 148

ii. Even if the Court Were to Address Address Arbitrability, Plaintiff's Claims Must Still Be Arbitrated .......... 148

IV. Conclusion .......... 20

## TABLE OF AUTHORITIES


**Page(s)**

**CASES**

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995)....................10, 11

*Am. Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc.*,
106 F. Supp. 2d 895 (N.D. Tex. 2000)....................12

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................10

*Bongalis-Royer v. RJ Worldwide, LLC*,
No. 4:14-CV-330, 2015 WL 12778846 (E.D. Tex. July 16, 2015)....................12

*DeClaire v. G & B Mcintosh Fam. Ltd. P'ship*,
260 S.W.3d 34 (Tex. App. 2008)....................13

*DIRECTV, Inc. v. Imburgia*,
577 U.S. 47 (2015)....................11

*Edwards v. Doordash, Inc.*,
888 F.3d 738 (5th Cir. 2018)....................18

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995)....................11

*Fleetwood Enters., Inc. v. Gaskamp*,
280 F.3d 1069, 1073 (5th Cir303 F.3d 570 (5th Cir. 2002)....................11

*Galan v. AT&T*,
No. A-17-CA-984-SS, 2018 WL 11471628 (W.D. Tex. Mar. 20, 2018)....................13

*Jia v. Nerium Int'l LLC*,
No. 3:17-cv-03057, 2018 WL 4491163 (N.D. Tex. Sept. 18, 2018)....................13

*JLR Glob., LLC v. Paypal Holding Co.*,
No. 4:22-CV-559, 2023 WL 2527158 (E.D. Tex. Mar. 15, 2023)....................12, 13

*Kubala v. Supreme Prod. Servs., Inc.*,
830 F.3d 199 (5th Cir. 2016)....................11, 17

*Martinez v. Experian Info. Sols., Inc.*,
No. 3:24-CV-0744-X, 2024 WL 3906775 (N.D. Tex. Aug. 22, 2024)....................19

*May v. Expedia, Inc.*,
No. A-16-CV-1211-RP, 2018 WL 4343445 (W.D. Tex. July 19, 2018)....................17

*McKimmy v. OpenSea*,
No. 4:22-CV-00545, 2023 WL 6370907 (S.D. Tex. Mar. 22, 2023) ....................................16

*Mendoza v. Fred Haas Motors, Ltd.*,
825 F. App'x 200 (5th Cir. 2020) ..........................................................................................11

*Meyer v. Uber Tech., Inc.*,
868 F.3d 66 (2d Cir. 2017)...........................................................................................14, 17

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022)...............................................................................................................10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)....................................................................................................................1

*Mumblow v. Monroe Broad., Inc.*,
401 F.3d 616 (5th Cir. 2005) ..................................................................................................12

*Peninsula Marine, Inc. v. Principle Indus. Servs., LLC*,
No. 2:23-CV-00104, 2024 WL 5036616 (S.D. Tex. Sept. 30, 2024)....................................13

*Phillips v. Neutron Holdings, Inc.*,
No. 3:18-CV-3382-S, 2019 WL 4861435 (N.D. Tex. Oct. 2, 2019) ................................14, 15

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967)...............................................................................................................18

*RealPage, Inc. v. Enter. Risk Control, LLC*,
No. 4:16-CV-00737, 2017 WL 661829 (E.D. Tex. Feb. 16, 2017)........................................18

*Roberts v. Uber Techs., Inc.*,
No. 5-23-CV-00545-FB-RBF, 2023 WL 11833598 (W.D. Tex. Aug. 8, 2023) .....................11

*Smith v. Spizzirri*,
601 U.S. 472 (2024)...............................................................................................................19

*Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*,
219 S.W.3d 563 (Tex. App. 2007)..........................................................................................12

*Wagle v. Parsons Corp.*,
No. CV H-19-0359, 2019 WL 13418327 (S.D. Tex. July 25, 2019).......................................13

*Walker v. Neutron Holdings, Inc.*,
No. 1:19-CV-574-RP, 2020 WL 703268 (W.D. Tex. Feb. 11, 2020) .....................................16

*Wright v. Greensky, Inc.*,
No. 20-CV-62441, 2021 WL 2414170 (S.D. Fla. June 14, 2021) ..........................................13

*Yanez v. Dish Network, L.L.C.*,
No. 24-50580, 2025 WL 1671611 (5th Cir. June 13, 2025)....................................................11

**STATUTES**

Federal Arbitration Act, 9 U.S.C. §§ 1, 2, 3, 4 .............................................................1, 10, 11, 20

Pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), Defendant Toyota Motor North America, Inc. ("Toyota") respectfully moves this Court to enter an Order compelling arbitration of Plaintiff Philip Siefke's claims and staying all proceedings pending arbitration.

## I. INTRODUCTION

Plaintiff alleges that Toyota unlawfully collected data from his vehicle through its Connected Services system and then sold this data to third parties, including Defendants Progressive Casualty Insurance Company ("Progressive") and Connected Analytic Services ("CAS"), without his consent. *See generally* ECF 1 ("Complaint"). Plaintiff's claims are unfounded and untrue—Plaintiff expressly consented to Toyota transmitting data to third parties to provide services that Plaintiff chose to sign up for.

But more importantly here, as the threshold issue in this case, the merits of Plaintiff's claims are not properly before the Court because Plaintiff, both affirmatively via Toyota's mobile application (the "Toyota App" or "App") and through his conduct, repeatedly accepted Toyota's Connected Services Terms of Use which contained a clear and conspicuous arbitration provision and class action waiver. Under the arbitration provision, Plaintiff agreed to resolve any disputes or disagreements regarding Toyota's "Services" and his vehicle "System," which broadly includes vehicle data collection and transmittal. *E.g.,* Ex. A, Declaration of Mike Edwards ("Edwards Decl."), Ex. 4. And, importantly, the scope of the arbitration provision (and other arbitrability questions) have been delegated to the arbitrator to decide in the first instance. *Id*. As set forth in more detail below, the Court should require Plaintiff to honor his contractual commitment to arbitrate his claims and "move the parties . . . into arbitration as quickly and easily as possible," as required by the FAA. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 22 (1983).

## II. BACKGROUND

### A. Plaintiff Activated Connected Services and Accepted Toyota's Connected Services Terms of Use

Plaintiff purchased a 2021 Toyota RAV4 (his "subject vehicle") on March 20, 2021. Compl. Compl. ¶ 35. This vehicle came equipped with a system that wirelessly transmits data to and from the vehicle. Edwards Decl. ¶ 5. With each new Toyota vehicle, including the subject vehicle, Toyota offers certain "Connected Services," which use data transmitted to and from their vehicles to enhance the Toyota customers' vehicle experiences. *Id.* Customers can choose to sign up for Toyota's Connected Services, and data collected from the vehicle will be used, as appropriate, to support the Connected Services the consumer has signed up for. *Id.* "Connected Services" refers broadly to services that Toyota provides to consumers through use of their vehicle data. *See id.*, Ex. 7 (Connected Services Privacy Notice, Effective April 11, 2022) ¶¶ I, I.A. Toyota maintains records documenting its consumers' choices to opt-in or out of the various Connected Services Toyota offers. *See id.* ¶¶ 6–21.

Toyota's records show that Plaintiff downloaded the Toyota App and enrolled his 2021 Toyota RAV4 on the App. Edwards Decl. ¶ 6. Through the Toyota App, Plaintiff was given the option to activate Connected Services for his vehicle. *Id.* Toyota's records show that Plaintiff activated Connected Services via the Toyota App on March 21, 2021 and March 9, 2024. *Id.* ¶¶ 7, 9. To activate Connected Services, Plaintiff had to affirmatively accept Toyota's Connected Services Terms of Use ("Terms of Use") on the Toyota App, which contained an arbitration provision and class action waiver.[1] *Id.* ¶ 8. As confirmed by Toyota's records, Plaintiff accepted

[1] "Toyota" is broadly defined in the Terms of Use to include "Toyota Motor Sales, USA, Inc. and/or its affiliates [or] Service Providers," which include "third parties (whether or not identified) who provide any service, equipment, or facilities in connection with the System or Services." Edwards Decl., Ex. 4 (Terms of Use, Effective March 7, 2023) at ¶¶ 1(a), 2(b). Toyota Motor

the Terms of Use through an intuitive, easy to follow consent flow in the Toyota App that clearly notified Plaintiff that he was agreeing to the Terms of Use and Toyota's Connected Services Privacy Notice ("Privacy Notice").[2] *See*, *e.g., id.* ¶ 14. Plaintiff could not have activated Connected Services without accepting the Terms of Use. *Id.* ¶ 8, 16.

When Plaintiff went through the process of accepting the Terms of Use in March 2021, the App first would have displayed a screen notifying Plaintiff that "[b]y continuing, you agree to Toyota's handling of vehicle data according to the Connected Services Terms of Use and Connected Services Privacy Notice." Edwards Decl. ¶ 10. The entirety of the screen would have been visible without needing to scroll. *Id.* The terms "Connected Services Terms of Use" and "Connected Services Privacy Notice" were hyperlinked in red text. *Id.* Immediately below the hyperlinks, Plaintiff would have been prompted to press a red button labeled "Save Changes." Toyota's records reflect that Plaintiff pressed "Save Changes" when he went through the App flow. *Id.*

---

North America, Inc. is a Toyota affiliate and is therefore a party to this agreement. *See* Edwards Decl. ¶ 2.

[2] The Connected Services Privacy Notice is also expressly incorporated into the Terms of Use. Edwards Decl., Ex. 4.




*Id.* ¶ 11.[3]

Second, in March 2021, Plaintiff would have been taken to a screen that gave him the option to participate in a trial of available Connected Services. Edwards Decl. ¶ 12. Plaintiff was provided the option to participate in the trial by pressing a red button labeled "Continue" at the bottom of the screen. *Id.* This screen included language notifying Plaintiff that "Terms of use

[3] Plaintiff's screen would have displayed the Subject Vehicle's VIN number and other vehicle specifics. Edwards Decl. ¶ 11 n.1.

apply." *Id.* Toyota's records reflect that Plaintiff pressed "Continue" when he went through the flow. *Id.*




*Id.* ¶ 13.

Third, when Plaintiff went through the process of accepting the Terms of Use in both March 2021 and March 2024, Plaintiff would have been shown a screen titled "Connected Services Master Data Consent." *See* Edwards Decl. ¶ 14 (emphasis added). That screen necessarily disclosed to Plaintiff in clear terms that, when he clicked the "Accept" button, he agreed that "on a regular and continuous basis [his] vehicle wirelessly transmits location, driving and vehicle health data to Toyota and its affiliates in order to deliver Connected Services and for internal

research, development, and data analysis." *Id.* ¶ 14. Below that were hyperlinks to the same Connected Services Terms of Use and the Connected Services Privacy Notice that Plaintiff already accepted in 2021 on the first screen. *Id.* Just below the hyperlinks, Plaintiff was again prompted to "Accept" or "Decline" the entire agreement. *Id.* Toyota's records reflect that Plaintiff pressed "Accept" when he went through the flow in March 2021 and March 2024. *Id.* ¶ 16. Had Plaintiff pressed "Decline," he would not have been able to access any Connected Services and data transmission from his vehicle would have been turned off. *Id.*



*Id.* ¶ 15.[4]

In both March 2021 and March 2024, once Plaintiff accepted the "Connected Services Master Data Consent," Plaintiff would have been given the option to select which Connected Services to enroll in. Edwards Decl ¶ 17. Toyota's records show that Plaintiff enrolled in Service Connect both times he went through the flow for Toyota's Service Connect. *See id.* ¶¶ 18, 20. By contrast, Plaintiff originally declined to enroll in Toyota's Insure Connect service on March 21, 2021. *Id.* ¶ 18. But he later accepted that service on March 7, 2023, agreeing to allow Toyota to share his driving data with CAS. *Id.* ¶ 19. He declined enrollment in Insure Connect again on March 9, 2024, at which time Toyota ceased sharing his driving data with CAS. *Id.* ¶ 20. Toyota's records reflect that on January 22, 2025, Plaintiff used the Toyota App to opt-out of receiving Connected Services. *Id.* ¶ 21.

The Terms of Use themselves expressly provide for acceptance through the flow, as well as through conduct. Specifically, the Terms of Use provide for acceptance by "checking a box or otherwise accepting any part of the [Terms of Use] via [Toyota's] App." Edwards Decl., Ex. 4 ¶ 3(a). They further provide for acceptance by "use or accept[ance] of the benefits of any of the Services" or simply "us[ing] a Vehicle."). *Id.* Toyota's records also show that Plaintiff used certain Connected Services and (naturally) his vehicle, thereby repeatedly and continuously accepting the Terms of Use by using his vehicle and the Connected Services. *See* Edwards Decl. ¶¶ 7, 9; *see also* Compl. ¶ 109 (alleging Defendant tracks Plaintiff as he "drive[s] to work, visit[s] family, or simply go[es] about [his] days").

---

[4] The March 2024 version of this screen would have had black "Accept" and "Decline" buttons instead of red. Edwards Decl. ¶ 15 n. 2.

**B. Toyota's Terms of Use Include a Clear and Conspicuous Arbitration Provision and Class Action Waiver**

Plaintiff was informed of his arbitration obligations repeatedly and prominently in easy-to-understand terms. At all relevant times, Toyota's Terms of Use have included a broad arbitration provision and class action waiver. [5] *See, e.g.,* Edwards Decl., Exs. 1–4 (Terms of Use in effect from March 20, 2021 through January 22, 2025). For example, when Plaintiff enrolled in Connected Services in March 2024, Toyota's March 7, 2023 Terms of Use were in effect. *Id.*, Ex. 4 ¶ 26. They included a text box at the top of the first page titled "NOTICE OF MANDATORY ARBITRATION PROVISION," which alerted Plaintiff that the "use of [Toyota's] [Connected Services] is subject to mandatory and binding arbitration of any disputes which may arise as provided in Section 19 below."

> **NOTICE OF MANDATORY ARBITRATION PROVISION:**
>
> **Use of our Services (as defined below) is subject to mandatory and binding individual arbitration of any disputes which may arise, as provided in Section 19 below. Please read all of that section carefully and do not use any of our Services if you are unwilling to arbitrate all disputes you may have with us as provided in that section.**

[5] When Plaintiff first enrolled in a Connected Services trial on March 21, 2021, he accepted the Terms of Use effective August 1, 2019. Edwards Decl. ¶ 23. This version of the Terms of Use includes an arbitration provision (like the others), but the formatting and wording of the agreement is slightly different. *See id.,* Ex. 1 ¶ 20. Any differences between the 2019 version and the later versions of the Terms of Use are immaterial, however, because the Terms of Use were amended on November 16, 2021 to include relevant language that carries through to the current operative Terms of Use. *Id.*, Exs. 2–4 ¶ 19. Each Terms of Use, including the last version that Plaintiff accepted, also provide that each Terms of Use supersedes all prior agreements that involve the subject matter of the Terms of Use. *Id.*, Exs. 2–4 ¶ 21(d) ("This Agreement (including these Terms of Use, the EULA, the Privacy Notice, and any Additional Terms) constitute the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all previous written or oral agreements between you and Toyota with respect to such subject matter."), Ex. 1 ¶ 21(h) (similar language). As such, for simplicity, this Motion focuses on the language in the Terms of Use effective March 7, 2023, which is also the predominant language since 2021. For the avoidance of doubt, the prior Terms of Use include the same or similar language as what is cited throughout. *See generally id.*, Exs. 1–3.

*Id.*, Ex. 4 at 1 (emphasis in original). Section 19, in turn, is entitled "Dispute Resolution and Mandatory Arbitration" and alerts consumers that "YOU [] AND TOYOTA EACH AGREE TO SUBMIT ANY DISPUTE RELATED TO THIS AGREEMENT (INCLUDING THE SOFTWARE OR SERVICES) TO BINDING INDIVIDUAL ARBITRATION RATHER THAN PROCEED IN COURT." *Id.*, Ex. 4 ¶ 19 (emphasis in original).

> 19. **DISPUTE RESOLUTION & MANDATORY ARBITRATION.** PLEASE READ THIS PROVISION CAREFULLY. IT INCLUDES AN AGREEMENT TO MANDATORY ARBITRATION, WHICH MEANS THAT YOU (INCLUDING, FOR THE PURPOSES OF THIS SECTION, ANYONE CLAIMING UNDER YOU OR ON YOUR BEHALF) AND TOYOTA EACH AGREE TO SUBMIT ANY DISPUTE RELATED TO THIS AGREEMENT (INCLUDING THE SOFTWARE OR SERVICES) TO BINDING INDIVIDUAL ARBITRATION RATHER THAN PROCEED IN COURT. THIS PROVISION ALSO INCLUDES A CLASS ACTION WAIVER, WHICH MEANS THAT YOU AGREE TO PROCEED WITH ANY DISPUTE INDIVIDUALLY AND NOT AS PART OF A CLASS ACTION, AND A JURY WAIVER. YOU AND TOYOTA EACH AGREE:

Paragraph 19(a) then states that the arbitration provision applies to any "dispute or disagreement [] regarding the Services, System, Software or Service Content or any other aspect of [the Connected Services Terms of Use]". *Id.*, Ex. 4 ¶ 19(a); *see id.*, Ex. 4 ¶ 1(a) (defining "Services" to include services "currently or in the past designated as 'Connected Services' within any of our mobile applications" or "that are provided to you with references to these Terms of Use").

In addition to the arbitration provision in Section 19, since November 16, 2021, the Terms of Use have incorporated Toyota's Vehicle Software End User License Agreement and Mobile Application End User License Agreement, which contain identical arbitration provisions as the one set forth above. Edwards Decl., Exs. 2–4 ¶¶ 1(b)(ii)–(iii), 10(a). The arbitration provision in every version of the Terms of Use in effect since Plaintiff purchased his vehicle in March 2021 has likewise included a class action waiver that expressly precludes mass arbitrations. *See id*, Ex. 1 ¶ 20; Exs. 2–4 ¶ 19(g). For example, the March 2023 Terms of Use inform consumers that they "WAIVE ANY RIGHT TO PURSUE DISPUTES ON A CLASS-WIDE BASIS . . . IN ANY

LAWSUIT, ARBITRATION, OR OTHER PROCEEDING." *Id.*, Ex. 4 ¶ 19(g) (emphasis in original).

## III. ARGUMENT AND CITATION TO AUTHORITY

### A. The FAA Applies and Requires Enforcement of Plaintiff's Arbitration Agreements.

The FAA applies and requires enforcement of Plaintiff's agreement to arbitrate his claims against Toyota. The FAA governs arbitration agreements arising out of transactions involving interstate commerce and dictates that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268 (1995) (interpreting § 2 to cover any transaction "affecting" interstate commerce). The Supreme Court has repeatedly clarified that the FAA "was designed to promote arbitration" and that the Act "embod[ies] [a] national policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345–46 (2011). This federal "policy favoring arbitration" requires that "a court [] hold a party to its arbitration contract just as the court would to any other kind." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

Here, the FAA applies to Plaintiff's agreement to arbitrate his claims because the Terms of Use state explicitly that "this arbitration agreement and any proceedings thereunder shall be governed by the [FAA]." Edwards Decl., Ex. 4 ¶ 19(d); *id.* ("You and Toyota each enter this arbitration agreement in connection with a transaction involving interstate commerce."). Moreover, the Terms of Use unequivocally involve interstate commerce because they govern the Connected Services provided to and data transmission from Plaintiff's vehicle, which was manufactured by Toyota (a Texas corporation) and purchased and driven in Florida by Plaintiff (a Florida resident). *See* Compl. ¶¶ 5, 35, 109. The Supreme Court has expansively construed the

phrase "involving commerce" as extending the FAA's reach to the full limit of Congress' Commerce Clause power. *See Dobson*, 513 U.S. at 268.

**B. Plaintiff's Claims Are Subject to a Valid and Binding Arbitration Agreement.**

The Fifth Circuit prescribes "two analytical steps" in determining whether to enforce an arbitration agreement. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "The first [step] is contract formation—whether the parties entered into *any arbitration agreement at all*." *Id*. "The second [step] involves contract interpretation to determine whether this claim is covered by the arbitration agreement." *Id.*; *Yanez v. Dish Network, L.L.C.*, No. 24-50580, 2025 WL 1671611, at *2 (5th Cir. June 13, 2025) (same two steps). "The parties may validly delegate the second inquiry, *i.e.*, arbitrability, to the arbitrator." *Roberts v. Uber Techs., Inc.*, No. 5-23-CV-00545-FB-RBF, 2023 WL 11833598, at *2 (W.D. Tex. Aug. 8, 2023); *see also Mendoza v. Fred Haas Motors, Ltd.,* 825 F. App'x 200, 202 (5th Cir. 2020) ("The analysis changes when the parties include a delegation clause giving the arbitrator primary authority to rule whether a specific claim is subject to arbitration.") (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). *See* Section III.B.2.(i), *infra* (the Terms of Use clearly and unmistakably delegate arbitrability to the arbitrator by incorporating the rules of the American Arbitration Association ("AAA")).

***1. Plaintiff Accepted the Arbitration Provision in Toyota's Terms of Use***

The threshold question of whether the parties formed an agreement to arbitrate is governed by ordinary state law principles. *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir.), *opinion supplemented on denial of reh'g*, 303 F.3d 570 (5th Cir. 2002). The FAA "allows parties to an arbitration contract considerable latitude to choose what law governs some or all of its provisions." *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 53-54 (2015). Consistent with this

principle, the Terms of Use include a Texas choice-of-law provision. Edwards Decl., Ex. 4 ¶ 19(i).[6]

"Under Texas law, a valid contract requires an offer, acceptance, mutual assent, and consideration." *Bongalis-Royer v. RJ Worldwide, LLC*, No. 4:14-CV-330, 2015 WL 12778846, at *4 (E.D. Tex. July 16, 2015). When assessing contract formation, Texas courts apply an "objective standard of what the parties said and how they acted, not on their subjective state of mind." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc*., 219 S.W.3d 563, 589 (Tex. App. 2007). Texas Courts recognize the validity of electronic contracts and routinely enforce "click-wrap" agreements of the kind at issue here, i.e. an agreement that "allows a consumer to assent to the terms of a contract by selecting an 'accept' button." *Bongalis-Royer*, 2015 WL 12778846, at *5 (quoting *Am. Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc.,* 106 F. Supp. 2d 895, 905 n.15 (N.D. Tex. 2000) (collecting cases); *see JLR Glob., LLC*, 2023 WL 2527158, at *4 (finding and enforcing valid clickwrap agreement to hyperlinked terms of use under Delaware law).

#### i. Plaintiff Unambiguously Assented to the Terms of Use via Toyota's App and Through His Conduct

Here, Plaintiff unambiguously manifested his assent to the Terms of Use—including the arbitration provision and class action waiver. "It is well established under Texas law that assent through an affirmative 'click' is sufficient to bind the parties." *Jia v. Nerium Int'l LLC*, No. 3:17-

---

[6] "When an agreement contains both a choice-of-law provision and an arbitration clause, courts will apply the substantive law of the state named in the choice-of-law provision." *JLR Glob., LLC v. Paypal Holding Co.*, No. 4:22-CV-559, 2023 WL 2527158, at *2 n.1 (E.D. Tex. Mar. 15, 2023) (Mazzant, J.), *recons. denied*, 2024 WL 4198003 (E.D. Tex. Sept. 13, 2024) (Mazzant, J.). And, regardless, no choice of law analysis is necessary here because the laws of any potentially relevant state do not conflict with the basic arbitration agreement enforcement bases raised in this Motion. *See Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 620 (5th Cir. 2005) ("[I]f the laws of the states do not conflict, then no choice-of-law analysis is necessary[.]") (citation omitted).

cv-03057, 2018 WL 4491163, at *3 (N.D. Tex. Sept. 18, 2018); *see JLR Glob., LLC.*, 2023 WL 2527158, at *4 ("In clickwrap agreements, an affirmative click is deemed an actual signature that binds the parties."). As set forth in Section II.A., *supra*, Plaintiff pressed "Save Changes" on the screen that would have alerted him that "[b]y continuing, [he] agree[d] to Toyota's handling of vehicle data according to the [Terms of Use] and [Privacy Notice]." Edwards Decl., ¶¶ 10–11. Plaintiff also affirmatively clicked "Accept" when prompted by his Toyota App to agree to the hyperlinked terms for the Connected Services Agreements, discussed above. *Id.* ¶¶ 14–16. Plaintiff did this twice—first on March 21, 2021, when Plaintiff first activated Connected Services, and again on March 9, 2024. *Id.*

Plaintiff also assented to the Terms of Use by engaging in conduct that amounts to acceptance under the Terms. "Under Texas law, a party may accept a contract through 'acts, conduct, or acquiescence in the terms of the contract.'" *Peninsula Marine, Inc. v. Principle Indus. Servs., LLC*, No. 2:23-CV-00104, 2024 WL 5036616, at *7 (S.D. Tex. Sept. 30, 2024) (quoting *DeClaire v. G & B Mcintosh Fam. Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App. 2008) (collecting cases). Fifth Circuit courts, and courts across the country, have found acceptance of an arbitration provision by conduct. *See, e.g.*, *Wagle v. Parsons Corp.*, No. CV H-19-0359, 2019 WL 13418327, at *3 (S.D. Tex. July 25, 2019) ("In addition to accepting the terms of the Arbitration Agreement by electronically signing it, Plaintiff also agreed to be bound by the Arbitration Agreement through his conduct[,]" including "accepting the offer of employment and working for [defendant] thereafter."); *Galan v. AT&T*, No. A-17-CA-984-SS, 2018 WL 11471628, at *4 (W.D. Tex. Mar. 20, 2018) (same); *Wright v. Greensky, Inc.*, No. 20-CV-62441, 2021 WL 2414170, at *17 n.19 (S.D. Fla. June 14, 2021) (plaintiff accepted the terms of loan agreement,

including arbitration provision, by drawing on loan account, where terms instructed that '[t]he first use of the . . . installment loan to make a purchase will constitute acceptance" of the agreement).

Consistent with the Toyota App's consent flow, the Terms of Use expressly provide for acceptance by "checking a box or otherwise accepting any part of the [Terms of Use] via our [] App." Edwards Decl., Ex. 4 ¶ 3(a). Indeed, Plaintiff *had* to press "Accept" to activate the Connected Services that form the basis of his Complaint. Edwards Decl. ¶ 16. But in addition to this, the Terms of Use also provide that consumers can accept them by "us[ing] or accept[ing] the benefits of any of the Services" or simply "us[ing] a Vehicle." *Id.,* Ex. 4 ¶ 3(a). Toyota's records show that Plaintiff used the App when he activated and enrolled in Connected Services. *See, e.g.,* Edwards Decl. ¶¶ 6–7, 9. And there is no question that Plaintiff drove his vehicle. *See, e.g.*, Compl. ¶ 109 (alleging Defendant tracks Plaintiff as he "drive[s] to work, visit[s] family, or simply go[es] about [his] days").

**ii. The Toyota App Reasonably Notified Plaintiff of the Terms of Use**

Courts will enforce online contracts "where the user had reasonable notice of the existence of terms—i.e., whether the notice was 'reasonably conspicuous.'" *Phillips v. Neutron Holdings, Inc.*, No. 3:18-CV-3382-S, 2019 WL 4861435, at *4 (N.D. Tex. Oct. 2, 2019) (citing *Meyer v. Uber Tech., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017)). Courts evaluate reasonable conspicuousness from the "perspective of a reasonably prudent smartphone user." *Id.* (quoting *Meyer*, 868 F.3d at 77). There is no question that here a reasonably prudent smart phone user was on notice of the existence of the Terms of Use.

The design of the Toyota App more than satisfies the criteria courts in the Fifth Circuit have found establish reasonable notice of hyperlinked terms in click-wrap agreements. For example, in *Phillips v. Neutron Holdings, Inc.*, the United States District Court for the Northern District of Texas considered the existence, appearance, and location of the hyperlinks and the

overall legibility of the sign-up screen at issue. 2019 WL 4861435, at *4–5. The court held that the design of the sign-up screen provided reasonably conspicuous notice, explaining that the "sign-up screen is visible on one page, [] the hyperlinks are in close proximity to the two sign-up buttons," the "notice is legible, and the hyperlinked words '**User Agreement & Terms of Service**' are in dark, bold font, making them stand out from both the white screen and surrounding gray text." *Id.* at 5.

The design and features of the relevant screens on the Toyota App are similar to *Phillips*:

- The first screen Plaintiff would have seen included hyperlinks to the Terms of Use and Privacy Notice that were offset from the uncluttered white background and surrounding gray text in bold, red lettering to indicate they were hyperlinks. Edwards Decl. ¶¶ 10–11.
- The hyperlinks were located immediately above legible text stating that "[b]y continuing, you agree to Toyota's handling of vehicle data according to the Connected Services Terms of Use and Connected Services Privacy Notice." *Id.*
- Immediately below this text there was a large red button stating "Save Changes," which Plaintiff had to press to proceed. *Id.*
- The entirety of the screen was visible without needing to scroll. *Id.*
- Plaintiff would then have been directed to the Connected Services – Trial screen, which expressly notified Plaintiff the "Terms of Use apply" to enrollment in Connected Services. *Id.* ¶¶ 12–13.
- Below that text was a large red button stating "Continue," which Plaintiff would have had to press to proceed. *Id.*

- Plaintiff would have been subsequently directed to the Connected Services Agreements screen, which was boldly titled "Connected Services Master Data Consent." *Id.* ¶¶ 14–15.
- The hyperlinks to the Terms of Use and Privacy Notice on this screen were similarly formatted in red, bold text to ensure that they popped out from their surroundings and were located close above the "Accept" button and the "Decline" button. *Id.*
- Again, Plaintiff would not have had to scroll to see the hyperlinks (or any other content on the screen). *Id.* at ¶ 15.

Given the hyperlinks' eye-popping formatting and location, the legibility of the relevant screens, and explanatory text and titles, a reasonable smartphone user was on notice that they were accepting the Terms of Use when prompted to press "Save Changes" on the first screen and "Accept" on the Connected Services Agreements screen. And upon clicking the hyperlinked Terms of Use, the user would have seen at the top of the first page a large text box with bold, capitalized letters stating, "NOTICE OF MANDATORY ARBITRATION PROVISION" and directing the user to the arbitration provision. Edwards Decl., Ex. 4 p. 1. Notably in this case, Plaintiff's decision to opt into Connected Services and Service Connect Communications, but ***opt out*** of Insure Connect, demonstrates that he was actively engaged in the flow as he moved through it. *See* Edwards Decl. ¶¶ 18–21. He had to carefully read the terms to understand which offerings he wanted to accept, and which he did not.

Numerous courts in this Circuit have found adequate notice on similar facts. *See, e.g.*, *Walker v. Neutron Holdings, Inc.,* No. 1:19-CV-574-RP, 2020 WL 703268, at *4 n.3 (W.D. Tex. Feb. 11, 2020) (holding web application gave adequate notice of User Agreement containing

arbitration provision and noting that "when a user clicks on the User Agreement link, the second full paragraph warns in capital letters: "Important Notice: This agreement is subject to binding arbitration."), *R. & R. adopted*, No. 1:19-CV-574-RP, 2020 WL 4196847 (W.D. Tex. Apr. 8, 2020); *McKimmy v. OpenSea*, No. 4:22-CV-00545, 2023 WL 6370907, at *2 (S.D. Tex. Mar. 22, 2023) ("There is reasonable notice when a user is required to click a "Continue" button and a statement is displayed directly above the button that informs users that by clicking "Continue," they are agreeing to the website's terms. Notice is particularly sufficient when the terms of service are hyperlinked and typed in bold colored font.") (citations omitted); *May v. Expedia, Inc.,* No. A-16-CV-1211-RP, 2018 WL 4343445, at *3 (W.D. Tex. July 19, 2018) (finding website sufficient to put plaintiff on notice that he was agreeing to and would be bound by hyperlinked Terms and Conditions where the hyperlinks were "in blue, as opposed to black, font to indicate they were hyperlinks"), *R. & R. adopted,* No. 1:16-CV-1211-RP, 2018 WL 4343427 (W.D. Tex. Aug. 27, 2018); *Meyer*, 868 F.3d at 78 (holding the design and language of screen provide reasonable notice because the screen is "uncluttered," the hyperlinks "appear[] directly below the buttons for registration" and have "dark print" that "contrasts with the bright white background," and "the entire screen is visible at once").

In sum, Plaintiff unambiguously assented to the Terms of Use via the Toyota App, which reasonably notified him that clicking "Save Changes" and later "Accept" and using his vehicle and the Connected Services constituted accepted of the terms, including the arbitration provision and class action waiver. The Court therefore should find that the parties formed an agreement to arbitrate.

### *2. All of Plaintiffs' Claims Against Toyota Are Covered by the Arbitration Agreement*

#### **i. Plaintiff's Arbitration Agreement Delegates All Remaining Issues to the Arbitrator**

Where, as here, Plaintiff's arbitration agreement contains a delegation clause, "the only question [] is whether the purported delegation clause is in fact a delegation clause—that is, if it evidences an intent to have the arbitrator decide whether a given claim must be arbitrated." *Kubala*, 830 F.3d at 202.

Here, the Terms of Use expressly incorporate the AAA rules. Edwards Decl., Ex. 4 ¶ 19(c) ("Arbitration under this Agreement shall be conducted and administered by the [AAA] pursuant to its Consumer Arbitration Rules."). The Fifth Circuit Court of Appeals has repeatedly held that incorporating the AAA rules "constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Edwards v. Doordash, Inc.*, 888 F.3d 738, 746 (5th Cir. 2018) (collecting cases). Accordingly, the Court should treat the delegation clause as valid and reserve for the arbitrator issues of arbitrability—including the issue of scope (i.e., whether Plaintiff's arbitration agreement covers his claims) and any challenges to the agreement's enforceability or conscionability. *Id.* To the extent Plaintiff attempts to raise any challenges to arbitration concerning the scope of the arbitration provision (or other arbitrability issues, like unconscionability, etc.) Plaintiff already agreed that those issues are for the arbitrator, not the Court, to decide. Edwards Decl., Ex. 4 ¶ 19(c).

#### **ii. Even if the Court Were to Address Arbitrability, Plaintiff's Claims Must Still Be Arbitrated**

Notwithstanding the delegation provision, were the Court to consider the issue of arbitrability, Plaintiff's claims in this action are covered by the broad arbitration provision, which applies to any "dispute or disagreement [] regarding the Services, System, Software or Service Content or any other aspect of [the Connected Services Terms of Use]". Edwards Decl., Ex. 4 ¶

19(a). As this Court recognized, "[t]he Supreme Court and Fifth Circuit have characterized similar clauses as broad clauses capable of expansive reach." *RealPage, Inc. v. Enter. Risk Control, LLC*, No. 4:16-CV-00737, 2017 WL 661829, at *5 (E.D. Tex. Feb. 16, 2017) (Mazzant, J.); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 397-98 (1967) (labelling as "broad" a clause requiring arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"); *Martinez v. Experian Info. Sols., Inc.*, No. 3:24-CV-0744-X, 2024 WL 3906775, at *3 (N.D. Tex. Aug. 22, 2024) (calling similar language "nearly infinitely broad").

Even under a narrow reading of the arbitration clause, the express allegations of the Complaint fall squarely within the provisions of the Terms of Use. The Complaint seeks to hold Toyota responsible for the "unauthorized collection and dissemination of private information collected from Toyota vehicles owned or leased by the Plaintiff and Class Members." Compl. ¶ 1. The Complaint goes on to allege that Toyota "captur[ed Plaintiff's] Driving Data through their ***connected services***." *Id.* ¶ 117 (emphasis added). These core allegations expressly refer to the "Services" in the Terms of Use (which include "Connected Services," as well as the use of the Toyota App) and regard the "System" (which is the "telematics system" installed in Plaintiff's vehicle). Edwards Decl., Ex. 4 ¶¶ 1(a), 2(a). Plaintiff further alleges that Toyota's dissemination of his data violated the Privacy Policy, which states that vehicle data "is used to deliver Connected Services to [consumers]" and is shared with third parties "to provide Connected Services." Compl. ¶¶ 21–24; *see* Edwards Decl.., Ex. 7 ¶ II.A.5. The Privacy Notice that Plaintiff challenges is ***expressly incorporated into the Terms of Use***. *Id.*, Ex. 4 ¶ 1(b)(i). This agreement directly governs Toyota's use of Plaintiff's driving data, which is exactly what Plaintiff seeks to recover for in his Complaint. Sliced a dozen different ways, there is no credible dispute that, at all relevant times, the broad arbitration provision in Toyota's Terms of Use encompasses disputes related to

the essence of Plaintiffs' Complaint. Thus, Plaintiffs' claims fit comfortably within the scope of Toyota's arbitration provision.

## IV. CONCLUSION

For the foregoing reasons, Toyota respectfully requests the Court grant this Motion to Compel Arbitration and stay this case pending the outcome of arbitration. *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").

Dated: July 8, 2025

Respectfully submitted,

**ALSTON & BIRD LLP**

*/s/ Theodore Stevenson, III*
Theodore Stevenson, III (TX 19196650)
Chase Tower
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
Telephone: (214) 922-3400
Facsimile: (214) 922-3899
Email: ted.stevenson@alston.com

*Counsel for Defendant Toyota Motor North America, Inc.*

**Certificate of Service**

I certify that I electronically filed this document through the Court's CM/ECF system on July 8, 2025, with notice of case activity generated and sent electronically to all counsel of record.

*/s/ Theodore Stevenson, III*

**Certificate of Conference**

I certify that counsel has complied with L.R. CV-7(h). This motion is opposed. The parties conducted a personal conference on June 20, 2025 via video conference. Cari Dawson participated on behalf of Toyota Motor North America, Inc., and John Yanchunis, Bruce W. Steckler, and Ronald Podolny participated on behalf of Plaintiff. The parties subsequently exchanged letters, but no agreement could be reached because Plaintiff disputes that he is bound by a mandatory arbitration provision. Discussions have ended at an impasse, leaving an open issue for the Court to resolve.

*/s/ Theodore Stevenson, III*