**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **PHILIP SIEFKE**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**TOYOTA MOTOR NORTH AMERICA, INC., PROGRESSIVE CASUALTY INSURANCE COMPANY, CONNECTED ANALYTIC SERVICES,**<br><br>Defendants. | ) | Case No.: 4:25-cv-00406 |

**<u>DEFENDANT PROGRESSIVE CASUALTY INSURANCE COMPANY'S JOINDER IN MOTION TO COMPEL ARBITRATION AND MEMORANDUM OF LAW IN SUPPORT</u>**

## TABLE OF CONTENTS

**Page**


I. NATURE AND STAGE OF THE PROCEEDING ..... 1

II. STATEMENT OF THE ISSUES ..... 1

III. RELEVANT ALLEGED FACTS ..... 1

- A. Facts Relevant to Plaintiff's Claims ..... 1
- B. Plaintiff's Agreement to Arbitrate ..... 3

IV. ARGUMENT ..... 5

- A. Legal Standard ..... 5
- B. The Court Should Compel Plaintiff's Claims Against Progressive to Arbitration. ..... 7
  - 1. Equitable Estoppel Applies Because Plaintiff Must Rely On His Agreements With Toyota To Assert A Claim Against Progressive ..... 8
  - 2. Equitable Estoppel Also Applies Because Plaintiff Alleges Substantially Interdependent Conduct Intertwined With His Claims With Toyota. ..... 12

V. CONCLUSION ..... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Crawford Professional Drugs, Inc. v. CVS Caremark Corp.*,
748 F.3d 249 (5th Cir. 2014) .... 6

*Fridl v. Cook*,
908 S.W.2d 507 (Tex. App.— El Paso 1995), .... 11

*G.T. Leach Builders, LLC v. Sapphire V.P., LP*,
458 S.W.3d 502 (Tex. 2015) .... 8, 9

*Gassaway v. Beacon Fabrication*, *LLC*,
No. 3:20-CV-983-L-BH, 2021 WL 1523008 (N.D. Tex. Feb. 24, 2021) .... 2

*Grigson v. Creative Artists Agency, LLC*,
210 F.3d 524 (5th Cir. 2000) .... 6, 7, 12, 14

*Harries v. Stark*,
No. 3:14-CV-2684-L, 2015 WL 4545071 (N.D. Tex. July 28, 2015) .... 7

*Hays v. HCA Holdings, Inc.*,
838 F.3d 605 (5th Cir. 2016) .... 6, 11, 12

*JLR Glob., LLC v. Paypal Holding Co.*,
Civil Action No. 4:22-CV-559, 2023 WL 2527158 (E.D. Tex. Mar. 15, 2023) .... 5

*LDF Const., Inc. v. Bryan*,
324 S.W.3d 137, 148–50 (Tex. App. 2010) .... 13

*Llagas v. Sealift Holdings, Inc*.,
No. 23-30047, 2023 WL 8613607 (5th Cir. Dec. 13, 2023) .... 11

*In re Merrill Lynch Trust Co*.,
235 S.W.3d 185 (Tex. 2007) .... 6

*Meyer v. WMCO-GP, LLC*,
211 S.W.3d 302 (Tex. 2006) .... 8

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*.,
460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) .... 7

*MS Dealer Serv. Corp. v. Franklin*,
177 F.3d 942 (11th Cir.1999) .... 14

*Pinto Tech. Ventures, L.P. v. Sheldon*,
526 S.W.3d 428 (Tex. 2017) .... 10

*Star Sys. Int'l Ltd. v. 3M Co.*,
No. 05–15–00669, 2016 WL 2970272 (Tex. App. May 19, 2016) ........................................................ 6

*Texas Green Star Holdings, LLC v. Certain Underwriters at Lloyd's London*,
734 F. Supp. 3d 595 (N.D. Tex. 2024) ........................................................................................ 7, 13

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1–16 ........................................................................................ 5

Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.* ................................................................................ 1

Defendant Progressive Casualty Insurance Company ("Progressive") respectfully joins in Defendant Toyota Motor North America, Inc.'s Motion to Compel Arbitration, ECF No. 31, and additionally moves this Court to compel arbitration of the claims brought by Plaintiff Philip Siefke ("Plaintiff") against Progressive in his Class Action Complaint, ECF No. 1 (the "Complaint" or "Compl.").

## I. NATURE AND STAGE OF THE PROCEEDING

Plaintiff filed this lawsuit on April 21, 2025, against Toyota Motor North America, Inc. ("Toyota"), Connected Analytic Services ("CAS"), and Progressive. Plaintiff only alleges two claims against Progressive—one for violation of the Federal Wiretap Act ("FWA"), 18 U.S.C. §§ 2510, *et seq.*, and one for tortious invasion of privacy—both of which are also pleaded against CAS and Toyota. Compl. ¶¶ 74-93 & 106-119.

By separate motion, Defendant Toyota seeks to compel Plaintiff's claims against Toyota to arbitration based on Plaintiff's agreements with Toyota. ECF No. 31. Progressive hereby joins in Toyota's motion to compel arbitration and respectfully submits that the claims against Progressive should likewise be compelled to arbitration.

## II. STATEMENT OF THE ISSUES

The Court must determine whether Plaintiff's claims against Progressive are subject to mandatory arbitration pursuant to the arbitration clause Plaintiff agreed upon with Toyota and under the doctrine of equitable estoppel.

## III. RELEVANT ALLEGED FACTS

### A. Facts Relevant to Plaintiff's Claims

Progressive hereby incorporates the facts and evidence in Toyota's Motion to Compel arbitration, as though fully set forth herein, ECF No. 31, including the relevant displays, policies and agreements attached to the Declaration of Mike Edwards. ECF No. 31-1 (Exs. 1-9). In ruling

on a motion to compel arbitration, the Court may consider evidence outside the Complaint. *See Gassaway v. Beacon Fabrication*, LLC, No. 3:20-CV-983-L-BH, 2021 WL 1523008, at *4 (N.D. Tex. Feb. 24, 2021), report and recommendation adopted as modified, No. 3:20-CV-983-L, 2021 WL 925800 (N.D. Tex. Mar. 11, 2021).

In particular, Plaintiff alleges he purchased a Toyota RAV4 XLE (the "RAV4") on or about March 20, 2021. Compl. ¶ 35. Plaintiff claims the RAV4 had a "'telemetry' tracking device" capable of tracking and collecting data about his driving ("Driving Data"). *Id.* Plaintiff alleges that Defendants say "they do not share Driving Data of Plaintiff and Class Members ***without their consent***," but that Defendants do in fact do so. *Id.* ¶ 21-22 (emphasis added).

According to the Complaint, Plaintiff contracted with Toyota with respect to his RAV4—which included contracts related to "Connected Services," a program using telematic Driving Data that Toyota provides customers. *Id.* ¶¶ 23, 121-22. Among the terms of those contracts, the Complaint cites Toyota's Privacy Policy, quoting as follows: "If you provide express prior consent, we may also share your Driving Data with our affiliates and non-affiliated insurance companies to provide you with usage-based insurance information and offers." *Id.* ¶ 24; *cf.* ECF No. 31-6 at 7; 31-7 at 10; and 31-8 at 10. Plaintiff further alleges the Toyota Privacy Policy states: "Unless we obtain your consent, we will not provide your Driving Data to other parties for their own purposes or use your Driving Data for our marketing purposes. Compl. ¶ 24. In brief, Plaintiff alleges that he entered into a contract with Toyota which stated that Toyota will share data with third party insurers, such as Progressive, only with "express prior consent." *See id.* ¶ 125.

Plaintiff further alleges that Progressive uses a data sharing program called "Snapshot" that "measure[s] a variety of factors related to" driving behavior in selling insurance. *Id.* ¶ 25 (alteration in original). He contends that Progressive promotes Toyota's involvement in this

program, and he quotes a news release stating in part that "Toyota owners who consent to share driving data from vehicles equipped with Toyota data communication modules will have the opportunity to share their information with Progressive for a potential discount on their auto insurance." *Id.* ¶ 28.

On January 21, 2025, nearly four years after purchasing his RAV4, Plaintiff alleges he attempted to sign up for insurance with Progressive. *Id.* ¶ 38. He claims that he elected not to use Progressive's data-sharing program, Snapshot. *Id.* ¶ 39. Afterward, he contends that "a background pop-up window appeared, notifying Plaintiff that Progressive was already in possession of his Driving Data up to January 20, 2025." *Id.* ¶ 40. Plaintiff alleges that he then called Toyota and spoke with a customer service representative who told him that, "when he purchased his Toyota vehicle, he unknowingly signed up for a trial of sharing his Driving Data captured by the Tracking Technology installed in Plaintiff's Toyota vehicle and that Plaintiff had to opt out of the data sharing." *Id.* ¶ 44. Plaintiff further claims that around March 31, 2025, he spoke to a Progressive customer service representative who told him that "Progressive obtains Driving Data of drivers from Defendant CAS." *Id.* ¶ 49. However, Plaintiff alleges that he never gave consent to Toyota to share any of this data with Progressive. *See id.* ¶ 47.

A core component of Plaintiff's Complaint is the allegation that his contracts did not authorize sharing of data among the Defendants without his consent, which he allegedly did not give. *Id.* ¶¶ 23-24, 28-29, 33-34, 122. Based on this allegation, amongst others, Plaintiff brings common law and statutory claims against all Defendants.

**B. Plaintiff's Agreement to Arbitrate**

As set forth above, when purchasing his RAV4, Plaintiff alleges he entered into contracts with Toyota which prevented it from sharing his data without his consent. Compl. ¶¶ 120-127. Although not alleged in his Complaint, those same contracts for "Connected Services," including

the Privacy Policies referenced in the Complaint, also contain mandatory arbitration clauses. *See* ECF No. 31 at 8-10; ECF No. 31-1, Exs. 1-4 (ECF Nos. 31-2, 31-3, 32-4, and 31-5). Based on those contracts with Plaintiff, Toyota now moves to compel arbitration. ECF No. 31. Progressive is a non-signatory to those agreements. However, as argued below, Plaintiff also should be required to arbitrate his claims against Progressive.

Toyota's motion to compel arbitration provides both the factual foundation and evidentiary support regarding Plaintiff's acceptance of the terms of the arbitration agreements. Progressive hereby incorporates by reference the arguments, facts, and evidence in Toyota's motion as though set forth herein. *See* ECF No 31. In brief—and as Toyota's motion explains in greater detail—on March 21, 2021, the day after he purchased his RAV4, Plaintiff affirmatively clicked "Accept" when prompted by his Toyota Mobile App to the Connected Services Terms of Use ("Terms of Use") and the incorporated Connected Services Privacy Notice ("Privacy Notice"), as a pre-requisite to activate Connected Services in his vehicle. *See* ECF No. 31 at 2-7. Plaintiff also accepted an updated version of the Terms of Use through his Toyota Mobile App on March 9, 2024. *Id.* Connected Services provides for telematics-based services for Plaintiff's vehicle. *Id*. Through his acceptance of the Connected Services contract, Plaintiff is therefore bound by the applicable Terms of Use and Privacy Notice. *See id.* at 12-17.

At all times, the Terms of Use to which Plaintiff agreed contained a broad arbitration provision. ECF No. 31 at 8-10. As explained in the March 7, 2023 Terms of Use, that agreement applies to any "dispute or disagreement [] regarding the Services, System, Software or Service Content or any other aspect of [the Connected Services Terms of Use]" and further requires Plaintiff "TO SUBMIT ANY DISPUTE RELATED TO THIS AGREEMENT . . . TO BINDING INDIVIDUAL ARBITRATION RATHER THAN PROCEED IN COURT." *Id.* at 9 (citing ECF

No. 30-5 (Ex. 4 at ¶ 19) (capitalization in original). Also through his agreements with Toyota, Plaintiff consented to the collection and transmittal of his data, including the transmission to third parties such as Progressive, for insurance purposes. *See, e.g.*, ECF No. 31-6 (Ex. 5 at p. 1). In relevant part, the agreement disclosed to Plaintiff, when he clicked the "Accept" button, that "on a regular and continuous basis [his] vehicle wirelessly transmits location, driving and vehicle health data to Toyota and its affiliates in order to deliver Connected Services and for internal research, development, and data analysis." ECF No. 31-1 at ¶ 14. Indeed, when acknowledging the Terms of Use, Plaintiff also acknowledged that "[b]y continuing, you agree to Toyota's handling of vehicle data according to the Connected Services Terms of Use and Connected Services Privacy Notice." *Id.* at ¶ 11. Additionally, and in connection with those services covered by the Terms of Use, Plaintiff enrolled in Insure Connect on March 7, 2023, which authorized Toyota to share his driving data with Connected Analytic Services and third-party insurers like Progressive. *See* ECF No. 31 at 7.

## IV. ARGUMENT

### A. Legal Standard

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, Progressive moves the Court to compel Plaintiff to submit his claims to binding arbitration and to stay all proceedings in this action pending that arbitration. As detailed in Toyota's motion, ECF No. 31, there is no genuine dispute that Plaintiff is bound by Toyota's Terms of Use which contain a binding arbitration clause. *Id.* at 2-9; *See also JLR Glob., LLC v. Paypal Holding Co.,* Civil Action No. 4:22-CV-559, 2023 WL 2527158, at *6 n.1 (E.D. Tex. Mar. 15, 2023) (Mazzant, J.).

As an initial matter, Progressive incorporates by reference all of the grounds for *enforcing* Toyota's arbitration agreement with Plaintiff, as set forth in Toyota's motion. ECF No. 31.

Accordingly, the only question raised separately in this motion is whether to extend the enforcement of that arbitration agreement to Progressive, as a non-signatory.

While Progressive is not a signatory to the arbitration agreements between Plaintiff and Toyota, the Fifth Circuit has held that, "pursuant to an equitable estoppel doctrine, a nonsignatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a signatory-plaintiff." *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 526 (5th Cir. 2000); *see also Crawford Professional Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249 (5th Cir. 2014) (a nonsignatory can compel a signatory to arbitrate on the basis of equitable estoppel).

In this case, Plaintiff's agreements with Toyota expressly apply the FAA and Texas law. *See, e.g.*, ECF No. 31-5 (Ex. 4 at ¶ 19(i)). Whether under Texas law or federal law as interpreted in this Circuit, courts apply an "intertwined claims" test of equitable estoppel, compelling arbitration on behalf of a non-signatory where a Plaintiff's claims are "so intertwined with and dependent upon" an agreement containing an arbitration clause as in "fairness" to warrant arbitration. *Grigson v*, 210 F.3d at 528; *see also Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 612 (5th Cir. 2016) (finding "because [the Texas Supreme Court] intimated at the validity of intertwined claims estoppel, because lower courts in Texas have applied the theory, and because arbitration of disputes is strongly favored under federal and state policy, we hold that the Texas Supreme Court, if faced with the question, would adopt intertwined claims estoppel"); *In re Merrill Lynch Trust* Co., 235 S.W.3d 185, 193-94 (Tex. 2007) (recognizing an "intertwined-claims" test where the claims against a non-signatory defendant are "intimately founded in and intertwined with the underlying contract obligations."). Moreover, like the FAA, Texas law "strongly favor[s]" arbitration. *Star Sys. Int'l Ltd. v. 3M Co*., No. 05–15–00669, 2016 WL 2970272, at *2 (Tex. App. May 19, 2016) (citing *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d

494, 499 (Tex. 2015)). And "questions of arbitrability must [also] be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

According to the Fifth Circuit, "intertwined claims" estoppel can apply in at least two instances. "First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. . . Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Grigson v*, 210 F.3d at 527. A defendant need only establish the applicability of one of the two doctrines for the Court to apply equitable estoppel. *Harries v. Stark*, No. 3:14-CV-2684-L, 2015 WL 4545071, at *11 (N.D. Tex. July 28, 2015). ("*Grigson* only requires 'one of the two independent bases to be present when compelling arbitration.'") (*quoting Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 259 F.Supp.2d 531, 540 (N.D.Tex.2003)); *see also Texas Green Star Holdings, LLC v. Certain Underwriters at Lloyd's London*, 734 F. Supp. 3d 595, 600 (N.D. Tex. 2024) (applying estoppel because "[w]hether or not the first prong of equitable estoppel applies, the second one surely does[.]"). Nevertheless, as argued below, both doctrines of equitable estoppel independently apply here.

### B. The Court Should Compel Plaintiff's Claims Against Progressive to Arbitration.

Plaintiff's claims against Progressive depend upon and are so intertwined with Plaintiff's agreements with Toyota and his claims against Toyota that well-established principles of equitable estoppel require Plaintiff to arbitrate with Progressive.

**1. Equitable Estoppel Applies Because Plaintiff Must Rely On His Agreements With Toyota To Assert A Claim Against Progressive.**

Under the first prong, sometimes referred to as direct benefits estoppel, "equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non-signatory." *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 306 (Tex. 2006). In other words, "[e]stoppel applies when the claim depends on the contract's existence and would be "unable to 'stand independently' without the contract." *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 528 (Tex. 2015) (quoting *In re Kellogg Brown & Root, Inc*., 166 S.W.3d 732, 739–40 (Tex. 2005)).

Here, Plaintiff's claims against Progressive depend on the Terms of Use for Connected Services. Inevitably, to determine if Plaintiff can state a claim against Progressive as well as Toyota, the Court must interpret Toyota's agreements to determine multiple issues, including (1) whether Toyota had his consent under the contracts to collect and share Driving Data; and (2) whether the scope of consent was exceeded when Progressive received his data from its co-Defendants. Plaintiff's action against Progressive cannot be separated from those terms, and therefore estoppel applies.[1]

The Court need look no further than Plaintiff's Complaint to see how closely tied Plaintiff's allegations against Progressive are to his underlying contracts with Toyota. The underlying dispute in this putative class action seeks to hold all Defendants responsible for the alleged "unauthorized collection and dissemination of private information collected from Toyota vehicles owned or leased by the Plaintiff and Class Members." Compl. ¶ 1. The Complaint goes

[1] To be clear, if this case proceeds to the merits, the evidence will show that Plaintiff gave consent directly to Progressive—in addition to any consent he may have separately expressed to Toyota—directly contrary to the allegations in his factually erroneous Complaint (which is one of many reasons why his claims lack merit). The merits of that particular factual dispute are not yet at issue on this motion, however.

on to allege that the basis for the Complaint is that Toyota "captur[ed Plaintiff's] Driving Data through their connected services." *Id.* ¶ 117 (emphasis added); *see also id.* ¶¶ 23, 24, 122 (quoting and referencing "connected services"). Notably, Plaintiff affirmatively activated and used Toyota's Connected Services (ECF No. 31 at 2-7), he admits that Toyota disclosed that it sells his Driving Data (¶ 24), and his claim of injury is directly tied to the handling of this data by the Defendants. (¶ 104) ("Plaintiff and Class Members have suffered harm and injury due to Defendant Toyota's unauthorized access to the communications containing their private and personal information in the form of Driving Data, as well as Toyota's sale of such information to other insurers."). Thus, Plaintiff bases these core allegations expressly on the "Services" in the Terms of Use, which included Toyota's "Connected Services" as well as the use of the Toyota Mobile App referenced in the complaint and the "telematics system" installed in Plaintiff's vehicle. *See* ECF No. 31 at 2-7. These claims are squarely within the definition of arbitrable disputes under the Terms of Service. *Id.*

Although Plaintiff's breach-of-contract claim is only pleaded against Toyota, Compl. ¶¶ 120-127, that alone is not determinative as to the arbitrability of the claims he pleads against all Defendants collectively. "Whether a claim seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the claim, not artful pleading." *G.T. Leach Builders, LLC*, 458 S.W.3d at 527 (quotations omitted). The allegations against Progressive presuppose the existence, scope, and, pivotally, breach of Toyota's relevant contracts, including its data-sharing provisions. *E.g.*, Compl. ¶¶ 24-30. Plaintiff alleges that Toyota's contracts with him expressly provide that driving data will only be shared with Progressive if he provides consent to do so. *Id.* ¶¶ 24, 125. Plaintiff alleges he had the option to consent, but chose to "opt[] out," with Toyota. *Id.* ¶ 126. Because Plaintiff alleges Toyota subsequently shared his data, he alleges Toyota

breached its contract and that this breach resulted in his damages, *id.* ¶ 127. In turn, his claims against Progressive are premised on the idea that it should not have received the data after he opted out with Toyota—and he apparently seeks the same damages from Progressive as he seeks from Toyota for its alleged breach of his contract.

In short, there is no escaping the fact that Plaintiff's allegations against Progressive fail if he gave Toyota valid consent under the Terms of Service, such that Toyota did not breach its agreements to not share data without consent. *See, e.g., id.* ¶ 28 (referencing alleged representation by Progressive that only "Toyota owners who consent to share driving data" with Toyota "will have the opportunity to share their information with Progressive[.]); ¶ 30 (alleging that Progressive misrepresents that "consent of an owner of a Toyota vehicle is required" before Toyota shares "Driving Data with Progressive."). Plaintiff only asserts wiretapping and invasions of privacy torts against Progressive that are entirely derivative of Toyota's use of driving data, alleged to be in violation of those agreements. *See, e.g.*, *id.* ¶ 86 (for wiretapping claim, "[i]n particular ***Toyota intercepted*** Defendant's Driving Data, while CAS and Progressive procured Toyota to intercept it.")

A plaintiff may avoid an arbitration clause only "if the facts alleged in support of the claim stand alone, are completely independent of the contract, and the claim could be maintained without reference to the contract." *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 437, 440 (Tex. 2017). But the facts alleged in the Complaint against Progressive cannot "stand alone," divorced from the context in which Plaintiff alleges Toyota breached its agreement not to share his data with Progressive without his consent. Compl. ¶ 24 (alleging Toyota's agreements state that Toyota requires "express prior consent" in order to "share your Driving Data with our affiliates and non-affiliated insurance companies [such as Progressive] to provide you with usage-based insurance

information and offers.”); ¶¶ 123-125 (Plaintiff “entered into express and implied contracts with the reasonable expectations (based on Toyota’s own express and implied promises) that Toyota would not share with third parties Plaintiff’s . . . Driving Data unless Toyota first obtained Plaintiff’s . . . express prior consent to do so[,]” which Toyota “breached” by “shar[ing] Plaintiff’s . . . Driving Data to Defendants CAS and Progressive without Plaintiff’s . . . express prior consent.”). These facts alone are enough to trigger equitable estoppel. *See, e.g.*, *Hays*, 838 F.3d at 609 (no abuse of discretion under Texas law to compel a non-signatory to arbitration where “the viability of this claim [] depends on reference to the Agreement” because “liability depends” on the terms of the agreement containing an arbitration clause); *Llagas v. Sealift Holdings, Inc.*, No. 23-30047, 2023 WL 8613607, at *4 (5th Cir. Dec. 13, 2023) (where the court must interpret the signatory agreement to determining statutory claims against a non-signatory, there is “a sufficient basis for equitable estoppel”).

In sum, this Court must ask “whether the particular tort claim [against Progressive] is so interwoven with the contract that it could not stand alone or, on the other hand, if a tort completely independent of the contract could be maintained without reference to the contract.”’ *Fridl v. Cook*, 908 S.W.2d 507, 511 (Tex. App.— El Paso 1995, writ dism'd), *overruled on other grounds*, *Delfingen v. Valenzuela*, 407 S.W.3d 791 (Tex. App.—El Paso 2013) (citations omitted). Plaintiff’s claims against Progressive cannot stand on their own if Toyota is found not to have breached its underlying agreements with Plaintiff by providing data to Progressive without Plaintiff’s consent. Equitable estoppel exists precisely to prevent the unfair result that Plaintiff would be required to arbitrate this fundamental underlying issue with Toyota, but not arbitrate his derivative claims with the non-signatory Progressive. *Id.* at 514.

### 2. Equitable Estoppel Also Applies Because Plaintiff Alleges Substantially Interdependent Conduct Intertwined With His Claims With Toyota.

Estoppel is independently warranted under the "intertwined claims" form of estoppel. The Fifth Circuit has held, in the context of arbitration agreements governed by Texas law, that the "application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Grigson*, 210 F.3d at 527 (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999)). "Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." *Id.* This test applies when there is a "tight relatedness of the parties, contracts, and controversies" and courts have employed the doctrine to dismiss "strategic pleading that seeks to avoid arbitration." *Hays,* 838 F.3d at 610 (citations omitted).

The Complaint alleges exactly the type of ostensibly concerted misconduct that warrants application of equitable estoppel here. Plaintiff alleges that Toyota and CAS "have been collecting [data] from Class Members' vehicles and selling to third parties, including Defendant Progressive" for many years. Compl. ¶ 1. Through devices placed by Toyota in its vehicles, "[i]nsurance companies, like Defendant Progressive, collect several types of driver behaviors in real-time, including speeding, hard baking, rapid acceleration, and driving at night or at rush hour." *Id.* ¶ 15. As a result, allegedly, "[i]nsurance companies (like Defendant Progressive), data brokers (like Defendant CAS), and automakers (like Defendant Toyota) profit from selling Driving Data." *Id.* ¶ 19. Additionally, allegedly, "Progressive promotes Toyota's involvement in the Snapshot ***data sharing scheme***," including through joint representations on Progressive's website that "Toyota

owners who consent to share driving data from vehicles equipped with Toyota data communication modules will have the opportunity to share their information with Progressive for a potential discount on their auto insurance." *Id.* ¶ 28 (emphasis added). Further, Plaintiff contends Toyota and Progressive jointly misrepresent that "consent of an owner of a Toyota vehicle is required before having Driving Data shared with Progressive." *Id.* ¶ 30. In fact, Plaintiff alleges that when he went to sign up for Progressive insurance, he was informed that Progressive already had his data from Toyota, under just such a purported scheme. *Id.* ¶¶ 40-42. The obvious implication of Plaintiff's allegations is that Toyota and Progressive make joint use of the Driving Data, which Toyota allegedly collects and shares with Progressive without obtaining consent.

Plaintiff need not allege what amounts to a "conspiracy" in order for the Court to find a sufficiently close relationship to apply equitable estoppel. For example, in *LDF Const., Inc. v. Bryan*, the Texas Court of Appeals affirmed a motion to compel arbitration in favor of a non-signatory and independent architect on a claim brought by a customer of a signatory construction company, alleging faulty workmanship and design problems. 324 S.W.3d 137, 148–50 (Tex. App. 2010). In that case, the Court agreed that the claims against the architect were so intertwined and interdependent with the claims against the construction company "that it would be impractical to resolve the disputes against them in arbitration without simultaneously resolving the claims." *Id.* at 149. Plaintiff's claims against Progressive and Toyota are as similarly intertwined and based on concerted conduct as the claims in *LDF Contruction*. *See also Texas Green Start Holdings*, 734 F. Supp. 3d at 600 (compelling arbitration under *Grigson's* second prong in favor of nonsignatory insurance adjustor in lawsuit against insurer for denying coverage).

This is a clear case where Plaintiff should not be able "to avoid" an arbitration agreement regarding use of his driving data simply "by bringing the action against a non-signatory charged

with acting in concert" with the defendant signatory, here Progressive, and asserting tort claims stemming from an underlying alleged breach of contract by Toyota. *Grigson*, 210 F.3d at 528. Under these circumstances, equitable estoppel compels Plaintiff to arbitrate his claims with Progressive as well as with Toyota. *See, e.g.*, *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947–48 (11th Cir. 1999), *abrogated in part on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009) (claims by signatory against non-signatory were arbitrable under a retail contract because (a) the claims were dependent on the money plaintiff paid pursuant to that contract and (b) plaintiff alleged non-signatory cooperated to defraud her into paying more under that contract).

***

In sum, Plaintiff's claims against Progressive are subject to mandatory arbitration for two independently sufficient reasons. First, they are based on his contracts with Toyota and cannot be proven without reference to those contracts. Second, Plaintiff's claims against Progressive are fundamentally intertwined with his claims against Toyota. The Court should compel arbitration of Plaintiff's claims against Progressive on each of these separate grounds.

## V. CONCLUSION

For the reasons explained above, Defendant Progressive Casualty Insurance Company respectfully requests that the Court compel arbitration under the doctrine of equitable estoppel and stay the case pending arbitration.

Dated: July 8, 2025

Respectfully submitted,

*/s/ David Levy*
David J. Levy
Bar No. 12264850
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002-5006
Telephone: 713.890.5000

Facsimile: 713.890.5001
david.levy@morganlewis.com

Andrew DeCarlow *(Pro Hac Vice)*
WA Bar No. 54471
**MORGAN, LEWIS & BOCKIUS LLP**
1301 Second Avenue, Suite 3000
Seattle, WA 98101
Telephone: 206.274.6400
Facsimile: 206.274.6401
andrew.decarlow@morganlewis.com

*Attorneys for Progressive Casualty Insurance Company*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 8, 2025, the undersigned caused a copy of the foregoing document to be served on all counsel of record, via the Court's CM/ECF system, pursuant to the Federal Rules of Civil Procedure.

*/s/ David Levy*
David J. Levy

**CERTIFICATE OF CONFERENCE**

In compliance with Local Rule CV-7(h), as counsel of record for Progressive Casualty Insurance Co., I hereby certify that I conferred with John Yanchunis, Bruce Steckler, and Ron Podolny, counsel for Plaintiff, via videoconference, on July 8, 2025. Plaintiff is opposed to this motion and no agreement could be reached at the conference, because Plaintiff disputes whether the claims are subject to binding individual arbitration. The parties are therefore at an impasse and agree that there is an open dispute for the Court to resolve.

/s/ *Andrew DeCarlow*
Andrew DeCarlow