# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| PHILIP SIEFKE, individually and on behalf of all others similarly situated, | §<br>§<br>§ | |
| *Plaintiff*, | §<br>§ | |
| v. | §<br>§ | |
| TOYOTA MOTOR NORTH AMERICA, INC., PROGRESSIVE CASUALTY INSURANCE COMPANY, and CONNECTED ANALYTIC SERVICES, | §<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:25-cv-406<br>Judge Mazzant |
| *Defendants.* | § | |

## <u>OMNIBUS MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are various motions regarding Defendants' request that the Court enter an Order to compel arbitration of Plaintiff's claims and stay all proceedings pending arbitration. Having considered the motions, all relevant pleadings, and the applicable law, the Court finds as follows:

1.  Defendant Toyota Motor North America, Inc.'s ("Toyota") Motion to Compel Arbitration and Stay Litigation and Memorandum of Law in Support (the "Motion to Compel") (Dkt. #31) should be **GRANTED**;

2.  Defendant Connected Analytic Services' ("CAS") Joinder to Motion to Compel Arbitration (Dkt. #32) should be **GRANTED**;

3.  Defendant Progressive Casualty Insurance Company's ("Progressive") Joinder in Motion to Compel Arbitration and Memorandum of Law in Support (Dkt. #33) should be **GRANTED**;

4.  Plaintiff's Motion to Extend Time to File Response to Defendant's Motion to Compel Arbitration and Stay Litigation (Dkt. #36) should be **DENIED as moot**;

5.  Toyota's Motion to Strike, and in the Alternative, Motion for Leave to File Sur-Sur-Reply (Dkt. #48) should be **DENIED as moot**;

6. Progressive's Joinder in Toyota's Motion to Strike, and in the Alternative, Motion to File Sur-Sur Reply (Dkt. #50) should be **DENIED as moot**; and

7. CAS's Joinder to Motion to Strike, and in the Alternative, Motion to File Sur-Sur Reply (Dkt. #51) should be **DENIED as moot**.

## BACKGROUND

### I.    Factual Background

Plaintiff Philip Siefke ("Plaintiff"), individually and on behalf of all others similarly situated (the "Proposed Class Members" and collectively, "Plaintiffs"), brings the instant suit against Toyota, CAS, and Progressive ("Defendants") (Dkt. #1). Toyota is an American multinational automotive manufacturing company, and CAS is Toyota's data analytics servicer (Dkt. #1 at ¶ 5; Dkt. #32 at p. 2). Plaintiffs allege Toyota and CAS collected private information from their owned or leased Toyota vehicles without consent (Dkt. #1 at ¶ 1). The private information at issue consists of the vehicles' location, speed, direction, braking and swerving/cornering events, image and voice data, and other personal identifiable information of the driver (the "Driving Data") (Dkt. #1 at ¶ 1).

Plaintiffs allege Toyota sold the Driving Data to third parties such as Progressive, an insurance company (Dkt. #1 at ¶ 1). Based on this disclosure, Plaintiffs assert several causes of action—(1) Defendants violated the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.* (Dkt. #1 at ¶¶ 74–93); (2) Toyota violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq.* (Dkt. #1 at ¶¶ 94–105); (3) Defendants are liable for invasions of privacy (Dkt. #1 at ¶¶ 106–19); (4) Toyota is liable for breach of express and implied contract (Dkt. #1 at ¶¶ 120–27); and in the alternative, (5) Toyota is liable for unjust enrichment (Dkt. #1 at ¶¶ 128–40).

The pertinent facts before the Court today are not found in Plaintiffs' class action complaint (the "Complaint") and exclusively relate to the purported arbitration agreement Plaintiff accepted.

2

In support of its allegations regarding this agreement, Toyota attaches to its Motion the sworn declaration of Mike Edwards (the "Edwards Declaration"), Senior Manager for Privacy at Toyota (Dkt. #31-1; Dkt. #62-2). The Edwards Declaration references Toyota's policies, practices, mobile application (the "Toyota App"), and records (Dkt. #31-1 at ¶ 3; Dkt. #62-2 at ¶ 4).

### A.    The Toyota App

Toyota alleges Plaintiff expressly consented to a clear and conspicuous arbitration provision (the "Arbitration Agreement") found in its Connected Services Terms of Use (the "Terms of Use") (Dkt. #31 at p. 6). Pursuant to the Arbitration Agreement, Toyota argues Plaintiff agreed to resolve any disputes or disagreements regarding Toyota's "Services" and the vehicles' "System," which broadly includes the collection and transmittal of the Driving Data (Dkt. #31 at p. 6). In support thereof, Toyota alleges its new vehicles sold in the United States are equipped with a system that wirelessly transmit data to and from the vehicles (Dkt. #31-1 at ¶ 5; Dkt. #62-2 at ¶¶ 6, 15). Toyota offers its "Connected Services" to eligible customers, which is a system that uses the transmitted data to enhance a customer's driving experience (Dkt. #31-1 at ¶ 5; Dkt. #62-2 at ¶ 6). Customers choose to sign up for Toyota's Connected Services, and only then can Toyota collect data from the vehicle to use, as appropriate, to support the service (Dkt. #31-1 at ¶ 5; Dkt. #62-2 at ¶ 6).

The Edwards Declaration outlines how an eligible Toyota driver (the "User") activates Connected Services on the Toyota App (Dkt. #31-1 at ¶¶ 8–15; Dkt. #62-2 at ¶¶ 12–16). First, a User would download the Toyota App and link their new Toyota vehicle by inputting the Vehicle Identification Number ("VIN"), an optional vehicle nickname, preferred servicing dealer, and vehicle capabilities (Dkt. #31-1 at ¶ 11; Dkt. #62 at p. 9; Dkt. #62-2 at ¶ 12). To continue, the User clicks a button labeled "Save Changes" (Dkt. #31-1 at ¶ 11; Dkt. #62 at pp. 9–10; Dkt. #62-2

at ¶ 12). Above this "Save Changes" button is a notice that states, "By continuing, you agree to Toyota's handling of vehicle data according to the Connected Services Terms of Use and Connected Services Privacy Notice" (Dkt. #31-1 at ¶¶ 10, 11; Dkt. #62-2 at ¶ 12). The terms "Connected Services Terms of Use" and "Connected Services Privacy Notice" are in red, boldface text, and they provide a hyperlink sending the User to digital copies of Toyota's Terms of Use and Privacy Notice (Dkt. #31-1 at ¶¶ 10–11; Dkt. #62-2 at ¶ 12).

Next, the User is taken to a screen that provides them with the option to participate in a free Connected Services trial (Dkt. #31-1 at ¶¶ 12–13; Dkt. #62-2 at ¶ 14). The User is notified that, "Terms of use apply" (Dkt. #31-1 at ¶¶ 12–13; Dkt. #62-2 at ¶ 14). To enroll in the trial, the User must click a red button labeled "Continue" at the bottom of this screen (Dkt. #31-1 at ¶¶ 12–13; Dkt. #62-2 at ¶ 14). The User then proceeds to a screen titled "Connected Services Master Data Consent," with two red buttons at the bottom of the page labeled, "Accept" and "Decline" (Dkt. #31-1 at ¶¶ 14–15; Dkt. #62-2 at ¶ 16). The User is given the following notice above these two red buttons:

> When you click the 'Accept' button, you agree that on a regular and continuous basis, your vehicle wirelessly transmits location, driving and vehicle health data to Toyota and its affiliates in order to deliver Connected Services and for internal research, development and data analysis.
>
> To learn more, review the Connected Services Terms of Use and Connected Services Privacy Notice.
>
> To disable your vehicle data transmission capability, press "Decline" or press the vehicle's SOS button.

(Dkt. #31-1 at ¶ 15; Dkt. #62-2 at ¶ 16).

Again, the terms "Connected Services Terms of Use" and "Connected Services Privacy Notice" are in red, boldface text, and they provide a hyperlink to digital copies of Toyota's Terms

of Use and Privacy Notice (Dkt. #31-1 at ¶ 15; Dkt. #62-2 at ¶ 16). If the User declines the "Customer Services Master Data Consent," they cannot access any Connected Services and data transmission from the vehicle is turned off (Dkt. #31-1 at ¶ 16; Dkt. #62-2 at ¶ 17). If the User accepts the "Customer Services Master Data Consent," they are given the option to select which Connected Services to enroll in, either Toyota's Service Connect Communication ("Service Connect"), Insure Connect, and Wi-Fi Connect (Dkt. #31-1 at ¶17; Dkt. #61-3).

### B.    The Terms of Use

Toyota alleges that at all relevant times,[1] Toyota's Connected Services Terms of Use included the Arbitration Agreement.[2] The Terms of Use included a text box at the top of the first page titled "NOTICE OF MANDATORY ARBITRATION PROVISION" in boldface text, which read as follows:

> Use of our Services (as defined below) is subject to mandatory and binding individual arbitration of any disputes which may arise, as provided in Section 19 below. Please read all of that section carefully and do not use any of Services if you are unwilling to arbitrate all disputes you may have with us as provided in that section.

(Dkt. #31-5 at p. 2) (the "Notice of Mandatory Arbitration Provision").

Section 19 of the Terms of Use is titled "DISPUTE RESOLUTION AND MANDATORY ARBITRATION" (Dkt. #31-5 at p. 15). It reads, in relevant part, as follows:

> PLEASE READ THIS PROVISION CAREFULLY. IT INCLUDES AN AGREEMENT TO MANDATORY ARBITRATION, WHICH MEANS THAT YOU … AND TOYOTA EACH AGREE TO SUBMIT ANY DISPUTE RELATED TO THIS AGREEMENT (INCLUDING THE SOFTWARE OR SERVICES) TO BINDING INDIVIDUAL ARBITRATION RATHER THAN PROCEED IN COURT. . . :

---

[1]  Toyota provided the Court with the various versions of the Terms of Use that were effective from March 20, 2021, to January 22, 2025 (the "Relevant Period") (See Dkt. #31-2; Dkt. #31-3; Dkt. #31-3; Dkt. #31-4; Dkt. #31-5).

[2]  Plaintiff does not allege the minor differences in the various Arbitration Agreement affect his arguments, so the Court will focus its analysis on the language in Toyota's Terms of Use, effective March 7, 2023.

(a) Informal Resolution of Disputes. If you or Toyota has a dispute or disagreement with the other regarding the Services, System, Software or Service Content or any other aspect of this Agreement (each, a "Dispute") . . . .

(b) Mandatory Arbitration of Unresolved Disputes. If after 60 days the parties are unable to resolve the Dispute, YOU AND TOYOTA BOTH AGREE, TO THE FULLEST EXTENT PERMITTED BY LAW, TO USE BINDING ARBITRATION, NOT A LAWSUIT (except for small claims court cases as described below) TO RESOLVE THE DISPUTE.

(c) Arbitration Entity & Rules. Arbitration under this Agreement shall be conducted and administered by the American Arbitration Association pursuant to its Consumer Arbitration Rules. If you and Toyota both agree, the arbitration may be conducted and administered by another arbitration entity.

(d) Federal Arbitration Act. You and Toyota each enter this arbitration agreement in connection with a transaction involving interstate commerce. Accordingly, this arbitration agreement and any proceedings thereunder shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA").

. . .

(i) Applicable Law. To the extent that the FAA does not supply substantive law necessary for the resolution of the Dispute, the laws of the State of Texas shall apply to the Arbitration . . . .

(Dkt. #31-5 at pp. 15–16).

## C.    Plaintiff's Use of the Toyota App

On March 20, 2021, Plaintiff purchased a new 2021 Toyota vehicle (the "Toyota Vehicle"), identified through its VIN, 2T3W1RFVXMC122334 (Dkt. #1 at ¶ 35; Dkt. #31-1 at ¶ 4; Dkt. #62 at p. 6). On March 21, 2021, Plaintiff downloaded the Toyota App, linked his vehicle, accepted the Customer Services Master Data Consent, and signed up for Connected Services—specifically, Service Connect and Wi-Fi Connect (Dkt. #61 at p. 6; Dkt. #62-2 at ¶¶ 7–8; Dkt. #62-19 through Dkt. #62-41). After that day, Plaintiff would continue to interact with the Toyota App. On March 9, 2024, Plaintiff enrolled in Service Connect but declined to enroll in Insure Connect, at which

time Toyota ceased sharing his driving data with CAS (Dkt. #62 at pp. 13–14; Dkt. #62-2 at ¶¶ 10, 21; Dkt. #62-21 through Dkt. #62-41); and on January 22, 2025, Plaintiff used the Toyota App to opt-out of Connected Services entirely (Dkt. #62-2 at ¶ 22; Dkt. #62-28 through Dkt. #62-52).

## II.    Procedural History

On July 8, 2025, Toyota filed its Motion to Compel (Dkt. #31), arguing that each of Plaintiffs' claims are subject to the Arbitration Agreement found in its Terms of Use. That same day, both CAS and Progressive each filed their respective Motions for Joinder, requesting the same relief asserted in Toyota's Motion (Dkt. #32; Dkt. #33). On August 5, 2025, Plaintiffs filed their Motion for Extension of Time to Respond (Dkt. #36).[3] Defendants' Motion to Compel and two Motions for Joinder are opposed (Dkt. #40). The parties exchanged a series of responses and replies briefing the Court on whether the parties agreed to arbitration (Dkt. #41; Dkt. #42; Dkt. #43; Dkt. #44; Dkt. #45; Dkt. #46; Dkt. #47; Dkt. #49).[4] On November 14, 2025, in response to the Court's October 10, 2025 Order (Dkt. #52), Plaintiff and Toyota filed Supplemental Briefs (Dkt. #61; Dkt. #62).[5] All pending motions are now ripe for adjudication.

## LEGAL STANDARD

Under the Federal Arbitration Act, "parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract." *Henry Schein, Inc. v. Archer & White*

---

[3]  The Court advised Plaintiff that its Motion for Extension of Time to Respond did not include a proposed order, which is why the Motion remains unresolved.

[4]  On October 7, 2025, Toyota filed its Motion to Strike, and in the alternative, Motion for Leave to File a Sur-Sur-Reply (Dkt. #48), asking the Court to strike Section II and III of Plaintiff's Sur-Reply (Dkt. #47). On that same day, Progressive and CAS joined Toyota's Motion to Strike (Dkt. #50; Dkt. #51), and Toyota filed its Sur-Sur-Reply in Support of its Motion to Compel (Dkt. #49).

[5]  On October 10, 2025, the Court granted Plaintiffs' Motion for Limited Discovery and ordered the parties to complete limited arbitration-related discovery on the issue of contract formation (Dkt. #52). The parties complied and briefed the issue for the Court (Dkt. #61; Dkt. #62).

*Sales, Inc.*, 586 U.S. 63, 65 (2019). The FAA provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA was designed to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (internal quotations omitted). Thus, the FAA establishes "'a liberal federal policy favoring arbitration agreements.'" *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Because arbitration is a creature of contract, the FAA "requires courts to enforce agreements to arbitrate according to their terms." *Id.* at 98 (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

Although there is a strong federal policy favoring arbitration, the policy "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 516 n.5 (5th Cir. 2019) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)). The FAA "does not require parties to arbitrate when they have not agreed to do so . . . ." *Volt*, 489 U.S. at 478 (citing *Byrd*, 470 U.S. at 219). Rather, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt*, 489 U.S. at 478 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).

When considering a motion to compel arbitration, courts apply a two-step framework. First, the Court must determine "whether the parties entered into any arbitration agreement at all." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "This first step is a question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims." *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017), *cert. denied*, 584 U.S. 1031 (2018). This initial question is for the Court. *Kubala*, 830 F.3d at 201. To determine whether there is a valid agreement to arbitrate, courts "'apply ordinary state-law principles that govern the formation of contracts.'" *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 939 (1995)).

If the Court finds that there is a valid agreement to arbitrate, it proceeds to the second question: whether the claim at issue is covered by the arbitration agreement. *IQ Prods.*, 871 F.3d at 348. In the second step, the Court must determine "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Webb*, 89 F.3d at 258 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). This second question is usually for the Court, unless the arbitration clause contains a valid delegation clause for an arbitrator to determine whether the claim falls within the arbitration agreement. *Kubala*, 830 F.3d at 201–02.

The party seeking to compel arbitration must prove the existence of an agreement to arbitrate by a preponderance of the evidence. *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012) (per curiam). Once the Court determines that there is a valid agreement to arbitrate, the strong federal policy favoring the enforcement of the arbitration agreements applies, and all ambiguities must be resolved in favor of arbitration. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th

Cir. 2004) (citing *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002)). As the Supreme Court has stated: "'[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers*, 363 U.S. at 582–83 (1960)). In this scenario, the party opposing arbitration bears the burden to demonstrate either that the agreement is invalid or that the claims are outside of the agreement's scope. *See Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004).

## ANALYSIS

Defendants move to compel Plaintiff to arbitrate his claims (Dkt. #31; Dkt. #32; Dkt. #33), arguing Plaintiff agreed to Toyota's Terms of Use, which contained the relevant Arbitration Agreement and class action waiver (Dkt. #31 at p. 13; Dkt. #31-5 at pp. 15–16).[6] The instant dispute hinges on the validity of the Arbitration Agreement under substantive Texas contract law.[7] The Court's analysis will be divided into three sections to determine whether Plaintiff must arbitrate his claims against each of the three Defendants: (1) Toyota; (2) CAS; and (3) Progressive.

---

[6] Toyota repeatedly references a class action waiver found in its Terms of Use throughout its Motion; however, Toyota requests the Court to compel arbitration and stay the case as to Plaintiff only (Dkt. #31 at pp. 6, 25). Toyota does not ask the Court to compel the Proposed Class Members to individual arbitration. For this reason, the Court does not analyze the class action waiver.

[7] Generally, the Court must first decide whether the FAA applies to the Agreement. Here, the Terms of Use state explicitly that "this arbitration agreement and any proceedings thereunder shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16" (Dkt. #31-5 at p. 16). Moreover, the parties do not dispute the applicability of the FAA (Dkt. #31 at p. 15; Dkt. #61), which provides that a party seeking to enforce an arbitration provision may petition a court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 2. Accordingly, because the Terms of Use explicitly state that the FAA governs the Arbitration Agreement and because this is an uncontested issue, the Court will apply the FAA to procedural matters. *See Pedcor Mgmt. Co., Inc. Welfare Benefit Plan v. Nations Pers. of Tex., Inc.*, 343 F.3d 355, 361 (5th Cir. 2003) (explaining that the FAA generally governs the construction of an agreement to arbitrate).

## I.  Toyota

Enforcement of an arbitration agreement involves two analytical steps. *Kubala*, 830 F.3d at 201. The first is contract formation—whether the parties entered into any arbitration agreement at all. *Id*. The second is contract interpretation—whether the claim at issue is covered by the arbitration agreement. *Id*. Generally, both steps are determinations for the Court to make. *Id*. However, "if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc.*, 586 U.S. at 69.

The Court must first determine whether the Arbitration Agreement constitutes a valid contract. To make this determination, courts apply "'ordinary state-law principles that govern the formation of contracts.'" *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) (quoting *Morrison v. Amway Corp.*, 517 F.3d 248, 254 (5th Cir. 2008)). Here, both parties agree that Texas law applies (Dkt. #31 at pp. 16–17; Dkt. #61 at p. 9). Thus, the validity of the Agreement will be determined under Texas contract law. *Kubala*, 830 F.3d at 202. As the following discussion will demonstrate, the Arbitration Agreement, which includes a delegation clause, is valid because it satisfies the elements of a binding contract and is not illusory.

### A.  The Arbitration Agreement satisfies the elements of a binding contract.

Under Texas law, a binding contract requires: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." *In re Capco Energy, Inc.*, 669 F.3d 274, 279–80 (5th Cir. 2012) (citation modified) (quoting *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 n.17 (5th Cir. 2002) (applying Texas law)). The parties dispute whether Plaintiff accepted the Arbitration Agreement (Dkt. #61 at pp. 9–18; Dkt. #62 at pp. 9–14). Specifically, Plaintiff argues, "nothing in the [Toyota App] interface relied upon by Toyota led

[Plaintiff] or any other reasonable consumer to believe that he had 'agreed' to the [Terms of Use] or the Arbitration Agreement therein" (Dkt. #61 at p. 10). Because Plaintiff's consent is dependent on his usage of the Toyota App and activation of Toyota's Connected Services, the parties characterize the Arbitration Agreement found in its Terms of Use as a "clickwrap agreement" (Dkt. #62 at pp. 9–14). The Court considers the nuances between "clickwrap," "browsewrap," and "sign-in-wrap" agreements. *See Phillips v. Neutron Holdings, Inc.*, No. 3:18-CV-3382-S, 2019 WL 4861435, at *3 (N.D. Tex. Oct. 2, 2019) (distinguishing between the various types of agreements in the context of electronically assenting to an arbitration agreement).

First, "[a] 'clickwrap agreement' allows a consumer to assent to the terms of a contract by selecting an 'accept' button on the web site. If the consumer does not accept the terms of the agreement, the web site will not complete the transaction." *Am. Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc. peepers*, 106 F. Supp. 2d 895, 905 (N.D. Tex. 2000) (citation omitted). Second, a "a browsewrap . . . does not require the user to manifest assent to the terms and conditions expressly-the user need not sign a document or click on an 'accept' or 'I agree' button," instead, "[a user] instead gives [their] assent simply by using the website." *S.W. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007). "Browsewraps may take various forms but typically they involve a situation where a notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink." *Id.* at *4. "The same principles apply to downloading and using smartphone apps." *Phillips*, 2019 WL 4861435, at *4 (citing *Wilson v. Huuuge, Inc.*, 351 F. Supp. 3d 1308, 1313 (W.D. Wash. 2018) ("When a user visits a website or downloads an app, they may be bound by the accompanying terms . . . through a 'clickwrap'

agreement or a 'browsewrap' agreement.")). Third, sign-in-wraps are agreements that "notify the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise the user that he or she is agreeing to the terms of service when registering or signing up." *Phillips*, 2019 WL 4861435, at *4 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75-76 (2d Cir. 2017)).

Here, the Toyota App seemingly relies on sign-in-wraps. First, to link a User's vehicle to the Toyota App, the User must input specific information and can only proceed by clicking the "Save Changes" button (Dkt. #31-1 at ¶ 11; Dkt. #62 at pp. 9–10; Dkt. #62-2 at ¶ 12). Above this "Save Changes" button is a notice that states, "By continuing, you agree to Toyota's handling of vehicle data according to the Connected Services Terms of Use and Connected Services Privacy Notice" (Dkt. #31-1 at ¶¶ 10, 11; Dkt. #62-2 at ¶ 12). This page reflects a sign-in-wrap because it notifies the User of the existence of Toyota's Terms of Use; however, instead of providing an "I agree" or "Accept" button specifically referencing the Terms of Use, the Toyota App notifies the User that they are agreeing to the Terms of Use by "continuing" with their vehicle's registration (Dkt. #31-1 at ¶¶ 10–11; Dkt. #62-2 at ¶ 12). *Phillips*, 2019 WL 4861435, at *4 (quoting *Meyer*, 868 F.3d at 75–76).

Second, to enroll in the free Connected Services trial, the User must click a red button labeled "Continue" at the bottom of this screen (Dkt. #31-1 at ¶¶ 12–13; Dkt. #62-2 at ¶ 14). In the text above "Continue," the User is notified that, "Terms of use apply" (Dkt. #31-1 at ¶¶ 12–13; Dkt. #62-2 at ¶ 14). This page also reflects a sign-in-wrap because it notifies the User of the existence of Toyota's Terms of Use, and again, instead of providing an "I agree" or "Accept" button, the Toyota App notifies the User that by clicking "Continue" and signing up for the free

Connected Services trial, they are agreeing to Toyota's Terms of Use (Dkt. #31-1 at ¶¶ 12–13; Dkt. #62-2 at ¶ 14). *Phillips*, 2019 WL 4861435, at *4 (quoting *Meyer*, 868 F.3d at 75-76).

Third, the User will eventually land on the screen titled "Connected Services Master Data Consent," with two red buttons at the bottom of the page labeled, "Accept" and "Decline" (Dkt. #31-1 at ¶¶ 14–15; Dkt. #62-2 at ¶ 16). The User is given the following notice above these two red buttons:

> When you click the 'Accept' button, you agree that on a regular and continuous basis, your vehicle wirelessly transmits location, driving and vehicle health data to Toyota and its affiliates in order to deliver Connected Services and for internal research, development and data analysis.
>
> To learn more, review the Connected Services Terms of Use and Connected Services Privacy Notice.

(Dkt. #31-1 at ¶ 15; Dkt. #62-2 at ¶ 16).

This page also reflects a sign-in-wrap because it notifies the User of the existence of Toyota's Terms of Use, and again, instead of providing an "I agree" or "Accept" button specific asking for consent to the Terms of Use, the Toyota App invites the User to review Toyota's Terms of Use before accepting the Connected Services Master Data Consent and signing up for this service. *Phillips*, 2019 WL 4861435, at *4 (quoting *Meyer*, 868 F.3d at 75-76).

"Courts typically enforce sign-in-wraps where the user had reasonable notice of the existence of the terms—*i.e.*, whether the notice was reasonably conspicuous. In making that determination, courts consider the perspective of a reasonably prudent smartphone user." *Phillips*, 2019 WL 4861435, at *4 (citation modified) (first citing *Meyer*, 868 F.3d at 75-76; then citing *Selden v. Airbnb, Inc.*, No. 16-cv-00933, 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016)). In *May v. Expedia, Inc.*, the court found that the plaintiff had actual knowledge and sufficient notice that by continuing

with a transaction, they were agreeing to the defendant's Terms and Conditions that were in effect at the time. No. A-16-CV-1211-RP, 2018 WL 4343445, at *3 (W.D. Tex. July 19, 2018), *report and recommendation adopted*, No. 1:16-CV-1211-RP, 2018 WL 4343427 (W.D. Tex. Aug. 27, 2018). In that case, the "Terms and Conditions" and "Privacy Policy" found above a "Continue" button were in blue, as opposed to black, font to indicate they were hyperlinks. *Id.* at *3.

Here, in the first screen, above the "Save Changes" button, the terms "Connected Services Terms of Use" and "Connected Services Privacy Notice" are in red, boldface text, and they provide a hyperlink sending the User to digital copies of Toyota's Terms of Use and Privacy Notice (Dkt. #31-1 at ¶¶ 10–11; Dkt. #62-2 at ¶ 12). Similarly, in the last screen regarding the Connected Services Master Data Consent, the terms "Connected Services Terms of Use" and "Connected Services Privacy Notice" are in red, boldface text, and they provide a hyperlink to digital copies of Toyota's Terms of Use and Privacy Notice (Dkt. #31-1 at ¶ 15; Dkt. #62-2 at ¶ 16).

The Court finds the hyperlinks to Toyota's Terms of Use found on the various screens with which Plaintiff interacted were reasonably conspicuous and placed Plaintiff on notice of the Arbitration Agreement. Accordingly, by signing up and linking his vehicle to the Toyota App and activating Connected Services, Plaintiff manifested his assent to be bound by Toyota's Terms of Use, which included the Arbitration Agreement. For this reason, the Court concludes the Arbitration Agreement satisfies the elements of a valid contract.

### B.    The Arbitration Agreement is not illusory.

The Court next examines Plaintiff's illusory contract argument in detail. Plaintiff argues the Terms of Use, which includes the Arbitration Agreement, provide "the unilateral right for Toyota to modify the Terms, and to provide notice in a variety of ways, rendering any consent obtained illusory" (Dkt. #61 at p. 20). Plaintiff specifically points to Section 11 of the Terms of Use,

effective August 1, 2019, titled "Modification to Agreement" (Dkt. #61 at p. 20; Dkt. #31-2 at p. 2). This section mirrors Section 10(b) in the most recent version of the Terms of Use, effective March 7, 2023, titled "Modification to Terms of Use/Services" (Dkt. #31-5 at pp. 8–9).[8]

Texas law rejects the validity of any arbitration agreement found to be "illusory." *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010). In Texas, "an arbitration clause is illusory if one party can 'avoid its promise to arbitrate by amending the provision or terminating it altogether.'" *Carey*, 669 F.3d at 205 (quoting *In re 24R*, 324 S.W.3d at 567). "Put differently, where one party to an arbitration agreement seeks to invoke arbitration to settle a dispute, if the other party can suddenly change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset." *Id.*

That is not the case here. On the contrary, had Plaintiff attempted to enforce the Arbitration Agreement, Defendant would have been bound by its own terms. Moreover, if there was a modification, Toyota was required to provide Plaintiff notice, and the effective date of any applicable change would have applied to prospective claims and not retroactively (Dkt. #31-5 at

---

[8] Section 10(b) reads as follows:

> We reserve the right in our sole discretion and at any time and for any reason, to amend, change or modify these Terms of Use. We also reserve the right in our sole discretion and at any time and for any reason, to amend, change or modify or discontinue any aspect or feature of our Services. This includes Services provided directly by us, as well as Services provided or supported by Service Providers (such as third party applications available via the App or the multimedia equipment in the Vehicle). The notice we provide you of such changes will vary based on the nature of the change. For instance, we will notify you of changes to the Terms of Use, by posting a revised version in the App, in the Agreement section of www.Toyota.com/privacyvts/, and/or in other relevant parts of the Website. For changes to the Services, and certain changes to the Terms of Use (such as changes we believe materially affect your rights under this Agreement), we will provide you notice via email or other written notice, through the App and/or through the multimedia equipment in the Vehicle. The effective date of the applicable change will be as set forth, as applicable, in the revised Terms of Use or the other notice we provide you. IF YOU DO NOT AGREE WITH ANY SUCH CHANGE, YOUR SOLE RECOURSE IS TO CANCEL YOUR SERVICE PLAN AND THE SERVICE. Your continued access or use of the Services after our notice indicates your acceptance of the change(s).

(Dkt. #31-5 at pp. 8–9).

pp. 8–9). *See Long v. Omni Hotels Mgt. Corp.*, No. CV H-15-1283, 2016 WL 11811587, at *3 (S.D. Tex. Mar. 24, 2016) ("The Fifth Circuit interprets *Halliburton* as holding the ability to modify an agreement does not render it illusory under Texas law where the 'power (1) extends only to prospective claims, (2) applies equally to both the employer's and employee's claims, and (3) so long as advanced notice to the employee is required before termination is effective.'" (quoting *Lizdale v. Vista Quality Mkts.*, 746 F.3d 222, 226 (5th Cir. 2014)). Plaintiff's lack of consideration argument also fails. Having determined the Arbitration Agreement is not illusory, "a mutual agreement to arbitrate claims is sufficient consideration to support an arbitration agreement." *Nelson v. Watch House Int'l, L.L.C.*, 815 F.3d 190, 193 (5th Cir. 2016).

Accordingly, the Arbitration Agreement is valid and enforceable.

### C.    The Arbitration Agreement includes a valid delegation clause.

The Supreme Court has instructed courts to look no further than the arbitrability of a particular claim when determining whether to compel arbitration; indeed, "courts must examine a complaint with care to assess whether any individual claim must be arbitrated," and "[t]he failure to do so is subject to immediate review." *KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (2011). However, "parties may agree that the 'gateway' question of arbitrability should be decided by an arbitrator, rather than a court." *See Beaumont Foot Specialists, Inc. v. United Healthcare of Tex.*, Inc., No. 1:15-CV-216, 2015 WL 9703796, at *2 (E.D. Tex. Dec. 22, 2015) (citing *Rent–A–Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)), *report and recommendation adopted*, No. 1:15-CV-216, 2016 WL 165023 (E.D. Tex. Jan. 14, 2016). "Pursuant to such a 'delegation' clause, an arbitrator is empowered to determine whether the agreement in fact requires the parties to arbitrate the dispute at hand." *Id.* (citing *Rent–A–Ctr., W., Inc.*, 561 U.S. at 68–69). "[This] is true even if the court thinks that the

argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc.*, 586 U.S. at 69.

Here, Toyota identifies a delegation clause through the incorporation of the American Arbitration Association ("AAA") rules in the Arbitration Agreement (Dkt. #31 at p. 23).[9] Plaintiff argues Toyota fails to consider the entire delegation clause which "does not contemplate that the AAA is the exclusive arbitral forum" (Dkt. #62 at p. 23). Specifically, the entire delegation clause states: "Arbitration under this Agreement shall be conducted and administered by the [AAA] pursuant to its Consumer Arbitration Rules. If you and Toyota both agree, the arbitration may be conducted and administered by another arbitration entity." (Dkt. #31-5 at p. 15). Plaintiff argues, "AAA's rules, including Rule 7(a) that provides that the arbitrator may determine its own jurisdiction, are optional" and thus, "[a]nother arbitral forum, with different rules that do not contain a Rule 7(a) analog, may apply, undercutting Toyota's claim that the delegation clause is clear and unmistakable" (Dkt. #61 at p. 23).

The Court disagrees. The express incorporation of the AAA Consumer Arbitration Rules, including Rule 7(a), "constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Edwards*, 888 F.3d at 746 (citation modified) (quoting *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 262–63 (5th Cir. 2014)). Because Toyota has not agreed that the arbitration would be conducted and administered by another arbitration entity other than the AAA, adherence to Rule 7(a) of the AAA's Consumer Arbitration Rules is not optional as Defendant contends.

---

[9]   Under Rule 7(a) of the AAA's Consumer Arbitration Rules, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *Edwards v. Doordash, Inc.*, 888 F.3d 738, 746 (5th Cir. 2018).

Accordingly, the delegation clause is valid and Plaintiff's remaining arguments regarding the validity of the Arbitration Agreement should be addressed by the arbitrator.

## II.    CAS

The Court will next consider CAS's Joinder to Toyota's Motion to Compel (Dkt. #32). CAS contends it is a Toyota affiliate as it provides Toyota's Insure Connect program through the Connected Services at issue (Dkt. #32 at p. 2). CAS argues The Terms of Use expressly provide that Toyota and its affiliates—including CAS—can compel any dispute "regarding the Services, System, Software or Service Content" to binding arbitration (Dkt. #32 at pp. 2–3). The Court agrees. Toyota and its affiliates are considered collectively as "Toyota" within the Terms of Use (Dkt. #31-5 at p. 2). Accordingly, the Arbitration Agreement extends to the disputes between CAS and Plaintiff.

## III.    Progressive

The Court will next consider Progressive's Joinder in Toyota's Motion to Compel (Dkt. #33). Progressive's ability to rely on the Arbitration Agreement is distinguishable from CAS's status as a Toyota affiliate. Although it is non-signatory to the Arbitration Agreement, Progressive contends that Plaintiff should be compelled to arbitrate his claims against Progressive under an equitable estoppel doctrine (Dkt. #33 at p. 10).

The Fifth Circuit has held, "in certain limited instances, pursuant to an equitable estoppel doctrine, a non-signatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a signatory-plaintiff." *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 526 (5th Cir. 2000). In *Grigson*, the Fifth Circuit echoed the Eleventh Circuit's guardrails when applying the equitable estoppel doctrine:

> Existing case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

*Id.* at 527 (quoting *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342 (11th Cir. 1984)).

Whether or not the first prong of equitable estoppel applies, the second one does. Plaintiffs sued Progressive for obtaining the Driving Data from Toyota without their consent (Dkt. #1 at ¶ 1). Based on this purportedly unlawful disclosure, Plaintiffs asserts Progressive violated the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.* (Dkt. #1 at ¶¶ 74–93) and Progressive is liable for invasions of privacy (Dkt. #1 at ¶¶ 106–19). Plaintiff argues his "claims against Progressive are not based on a violation of the [Terms of Use], and are not so intertwined with those against Toyota, as to render meaningless any arbitration against Toyota without Progressive's participation" (Dkt. #61 at p. 29).

The Court sees it differently. Whether or not Progressive violated the Federal Wiretap Act and is liable for invasions of privacy will be affected by the existing contracts between Plaintiffs and Toyota. Specifically, whether Toyota was authorized to disclose the Driving Data to Progressive will depend on arguments made in reliance on the Connected Services Terms of Use and Privacy

Notice. As a result, the Arbitration Agreement extends to disputes between Progressive and Plaintiff.

## IV.    Remaining Motions

Having determined each of Plaintiff's claims are subject to the Arbitration Agreement found in its Terms of Use, the Court need not consider Toyota's Motion to Strike, and in the Alternative, Motion for Leave to File Sur-Sur-Reply (Dkt. #48), Progressive's Joinder in Toyota's Motion to Strike, and in the Alternative, Motion to File Sur-Sur Reply (Dkt. #50), and CAS's Joinder to Motion to Strike, and in the Alternative, Motion to File Sur-Sur Reply (Dkt. #51). Further, because the Court granted Plaintiffs' Motion for Limited Discovery and ordered the Plaintiff to supplement his briefing on the Arbitration Agreement (Dkt. #52), the Court need not consider Plaintiff's Motion to Extend Time to File Response to Defendant's Motion to Compel Arbitration and Stay Litigation (Dkt. #36).

## CONCLUSION

It is therefore **ORDERED** that Defendant Toyota Motor North America, Inc.'s Motion to Compel (Dkt. #31), Defendant Connected Analytical Services' Joinder to Motion to Compel Arbitration (Dkt. #32), and Defendant Progressive Casualty Insurance Company's Joinder in Motion to Compel Arbitration and Memorandum of Law in Support (Dkt. #33) are hereby **GRANTED**.

It is further **ORDERED** the case against Defendants is **STAYED** pending arbitration, and the parties must notify the Court upon completion of the arbitration to reinstate the case.

It is further **ORDERED** that Plaintiff's Motion to Extend Time to File Response to Defendant's Motion to Compel Arbitration and Stay Litigation (Dkt. #36), Toyota's Motion to Strike, and in the Alternative, Motion for Leave to File Sur-Sur-Reply (Dkt. #48), Progressive's

Joinder in Toyota's Motion to Strike, and in the Alternative, Motion to File Sur-Sur Reply

(Dkt. #50), and CAS's Joinder to Motion to Strike, and in the Alternative, Motion to File Sur-Sur-

Reply (Dkt. #51) are hereby **DENIED** as moot.

      **IT IS SO ORDERED.**

      **SIGNED this 2nd day of December, 2025.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE